# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE___JUN 2 0 2013

CHIEF JUSTICE



This opinion was filed for record
at 8:00 am on June 20, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| COLUMBIA COMMUNITY BANK, | NO. 87174-4 |
| Respondent/Cross Appellant, | EN BANC |
| v. | |
| NEWMAN PARK, LLC, | Filed     JUN 2 0 2013 |
| Appellant/Cross Respondent. | |

GORDON McCLOUD, J.—The goal of equity is to do substantial justice. Equity exists to protect the interests of deserving parties from the "harshness of strict legal rules."[1] Washington courts embrace a long and robust tradition of applying the doctrine of equity.[2]

The question here is whether equitable subrogation—a species of equity developed to prevent unjust enrichment—is available to a lender to ameliorate the otherwise harsh consequence of a strict reading of the recording act, chapter 65.08

---

[1] *Rodriguez v. Dep't of Labor & Indus.*, 85 Wn.2d 949, 953, 540 P.2d 1359 (1975) (quoting *Ames v. Dep't of Labor & Indus.*, 176 Wash. 509, 513-14, 30 P.2d 239 (1934)).
[2] *See Hamm v. State Farm Mut. Auto. Ins. Co.*, 151 Wn.2d 303, 326, 88 P.3d 395 (2004) (Sweeney, J., dissenting).

RCW. Specifically, in this case, the issue is whether a lender who is tricked into refinancing property that the borrower lacked the authority to pledge as a security can benefit from equitable subrogation, when that lender had no preexisting interest in the property. The lender argues that equitable subrogation applies in this mortgage refinancing context. The property owner-debtor argues that the lender's lack of a preexisting interest in the property bars it from equitable subrogation because of the "volunteer rule," which would characterize such a lender as essentially an intermeddler unworthy of the protection of equity.

In accordance with our prior case law, with the modern trend, and with our traditional robust reading of the doctrine of equity, we reject the volunteer rule as a bar to equitable subrogation. We confirm what our recent prior decisions have suggested, that is, that *Restatement (Third) of Property: Mortgages* § 7.6 (1997) provides the more well-reasoned rule for determining whether a later lender has a sufficient interest in property to step into the shoes of an earlier lender with a higher priority lien. We therefore affirm the decision of the Court of Appeals, which held that the lender in this case—who was defrauded into paying off a loan of approximately $400,000—was entitled to be equitably subrogated to the position of the first priority lienholder.[3]

## FACTS

Newman Park, LLC, a development company, was formed for the purpose of developing a piece of real property in Thurston County. Newman Park was

---

[3] The lender, of course, is entitled to equitable subrogation only to the extent of the first priority lienholder's current obligation.

owned by 12 members. Eleven members were individuals, and the 12th member was a company owned by Joseph Sturtevant: Landmark Development Ventures. Landmark held a 39 percent interest in Newman Park, and the other 11 members held the remaining 61 percent interest.

In 2004, Newman Park purchased the Thurston County property that is the subject of this litigation. To pay for the property, it obtained a loan of about $400,000 from Hometown National Bank (HNB). HNB's loan to Newman Park was secured by a deed of trust on the property itself. Although the loan was negotiated by Sturtevant, all the members of Newman Park knew of and ratified the loan.

In 2008, without the knowledge of the other owners of Newman Park, Sturtevant went to a different bank, Columbia Community Bank (CCB), and requested a loan for his 95 percent-owned company, Trinity. CCB agreed to loan Sturtevant $1.5 million. Trinity had nothing to do with Newman Park, but CCB's loan to Sturtevant-Trinity was secured by a second deed of trust on the Newman Park property, which Sturtevant signed as owner of Landmark, his company with a 39 percent interest in Newman Park.

CCB was aware that HNB had a priority security interest in the Newman Park property, so CCB required Sturtevant to use $400,000 of CCB's $1.5 million loan to pay off HNB fully as a condition of CCB loaning Sturtevant the new money. Through this transaction, essentially a refinance, CCB expected to acquire the first priority security interest in the property. CCB's expectation was

understandable because HNB was the only prior lender with an interest in the property, and HNB's interest was extinguished when its $400,000 loan was paid off out of CCB's loan to Sturtevant.

Unfortunately, Sturtevant had no authority to sign the deed of trust giving CCB a security interest in Newman Park's property. Newman Park's operating agreement required a membership interest of at least 80 percent to approve such a transaction. Sturtevant's company Landmark had only a 39 percent membership interest. Hence, Sturtevant lacked authority to grant the Newman Park property to CCB as a security interest.

CCB was unaware that Sturtevant lacked the authority to give CCB that deed of trust. CCB was unaware because Sturtevant had forged some of the documents CCB reviewed before agreeing to make the loan. The key forgery was Sturtevant's alteration of the original operating agreement for Newman Park. The unaltered operating document correctly identified Sturtevant's company Landmark as a 39 percent stakeholder with 11 other individuals. Sturtevant, however, showed CCB a version of the operating agreement listing Landmark as the only stakeholder, with a 100 percent membership interest.[4]

The deception came to light in 2009. At that time, Sturtevant's company Trinity, which received the $1.5 million loan from CCB, defaulted. CCB tried to foreclose on the Newman Park property. Newman Park objected that it had never

---

[4] CCB claims Sturtevant presented the same falsified operating agreement to HNB when securing the HNB loan, which was ratified by the Newman Park members. Reply Br. of Resp't at 23. Newman Park does not dispute this.

given CCB a security interest in the property and filed a complaint to prevent the foreclosure. That was when CCB discovered Sturtevant's deception.

In 2010, CCB sought a declaration from the superior court that the deed of trust it received from Sturtevant was valid under various agency theories and, in the alternative, that it had acquired a lien on the property through the doctrine of equitable subrogation. Newman Park sought a contrary declaration that the deed was invalid. On motions for summary judgment, the trial court ruled in favor of Newman Park on the question of the deed's validity. It held that the deed of trust on the property Sturtevant gave to CCB was invalid because Sturtevant's company, Landmark, lacked the 80 percent membership interest in Newman Park required for such a transaction.

But the trial court also held that because CCB had paid off the $400,000 loan from HNB to ensure a priority position for its security interest, CCB was equitably subrogated to HNB's position and acquired an equitable lien on the Newman Park property in the amount of the $400,000 loan from HNB. The trial court denied Newman Park's motion for attorney fees because both parties prevailed on substantial issues, which they plainly did.[5]

In 2012, the Court of Appeals affirmed.[6] It rejected Newman Park's argument that CCB was a mere volunteer and, hence, could not benefit from

---

[5] Because we affirm the trial court and the Court of Appeals, it remains true that both parties prevailed on substantial issues. Newman Park is thus still not entitled to attorney fees, and its claim to the contrary is rejected.

[6] *Columbia Cmty. Bank v. Newman Park, LLC*, 166 Wn. App. 634, 279 P.3d 869 (2012).

equitable subrogation. The Court of Appeals based its holding rejecting the so-called "volunteer rule" in Washington on a recent case from this court, *Bank of America, NA v. Prestance Corp.*, 160 Wn.2d 560, 576, 160 P.3d 17 (2007). We accepted review of the equitable subrogation issue only, to determine whether the volunteer rule survives as a bar to equitable subrogation in the refinance context. The answer is no. We hold that under the circumstances of this case, CCB is entitled to be equitably subrogated to HNB's position. We therefore affirm the trial court and the Court of Appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

We review a trial court's order granting summary judgment de novo. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). On review of a summary judgment order, we view all the evidence in the light most favorable to the nonmoving party. *Id.* Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

### II. EQUITABLE SUBROGATION OF COLUMBIA COMMUNITY BANK

#### a. *The General Rules of Equitable Subrogation in Washington*

Equitable subrogation allows one party to step into the shoes of a second party who is owed a debt or obligation and to receive the benefit of that debt or obligation, in the absence of any contractual agreement or assignment of rights between those two parties or the debtor. *See Winters v. State Farm Mut. Auto. Ins.*

*Co.,* 144 Wn.2d 869, 875, 31 P.3d 1164 (2001). Subrogation is permitted without assignment in order to prevent unjust enrichment. *See Prestance,* 160 Wn.2d at 576. Unjust enrichment is an equitable doctrine; thus this sort of subrogation is called equitable subrogation.

In its simplest form, equitable subrogation involves three parties: a lender, a debtor, and a third party.[7] If a third party pays a debtor's outstanding loan to the lender without any formal agreement between the parties, then, under certain circumstances, equity permits the third party to take over the lender's interest and receive the continuing payments of the debtor—to step into the lender's shoes to the extent of the current obligation. In other words, the third party is subrogated to the lender's interest. The rationale is that subrogation prevents the windfall that would otherwise accrue to the debtor—that is, it prevents unjust enrichment.[8, 9]

Equitable subrogation takes a somewhat different form in the context of mortgage refinancing. In the refinancing world, equitable subrogation is considered "a tool by which real property lenders, or lienors, may replace the prior,

---

[7] As this court has commented, "Subrogation applies in many contexts, and while the overall purpose of preventing unjust enrichment is the same, many times the requirements will be tailored to the particular nuances of the situation." *Prestance,* 160 Wn.2d at 576. We do not suggest that equitable subrogation is limited to a three party situation.

[8] *See generally* Hannoch Dagan & James J. White, *Governments, Citizens, and Injurious Industries,* 75 N.Y.U. L. REV. 354, 383-85 (2000).

[9] Note that some commentators have objected to this restitution-based explanation of subrogation, claiming that "[t]he nature of the world of subrogation is a complicated, fragmented, multidoctrinal melange, which is not susceptible to any facile restatement." Michael Sean Quinn, *Subrogation, Restitution, and Indemnity,* 74 TEX. L. REV. 1361, 1363 (1996) (reviewing CHARLES MITCHELL, THE LAW OF SUBROGATION (1994)). This is a minority point of view. *Id.* at 1395.

senior lien position of an earlier in time lender by paying off that prior lender's loan."[10]

We recently described how equitable subrogation ensures priority of a security interest in the refinancing context:

> For example, suppose *A*, a homeowner, has two mortgages: one recorded first by bank *B* and one recorded second by bank *C*. Our recording act says *B* has a higher priority because it recorded first, putting the world on notice as to its interest in *A*'s land. If *D* fully discharges *B*'s debt, then equitable subrogation substitutes *D* for *B*, so *D* has a higher priority than *C*, even though *D* recorded after.

*Prestance*, 160 Wn.2d at 564 (citations omitted). In the refinancing situation, the party who would become unjustly enriched absent equitable subrogation is usually different than the party who would become unjustly enriched in other contexts. In the refinancing context, it is generally not the debtor who would become unjustly enriched by the payment of his or her debt by a third party; rather, it is the junior lienholder. The reason is that, absent subrogation, the third party's payment would bump the number two security interest into the number one position without the junior lienholder having taken any action to warrant such an advancement. *Id.* at 567. We prevent this unjust enrichment by subrogating the party paying off the priority interest to the party who held that interest, to the extent of the former lienholder's interest at that time.[11]

---

[10] Scott B. Mueller, *Is Equitable Subrogation Dead for Lenders and Insurers in Missouri?*, 66 J. MO. B. 196, 196 (2010).

[11] We note that the facts of this case do not implicate relative priorities under the recording act in a refinancing context.

b. *The Development of the Intermeddler Exception to Equitable Subrogation in Washington*

In Washington, unjust enrichment, and by extension equitable subrogation, has traditionally been restricted in application to a party who is not acting as a "volunteer." *Murray v. O'Brien,* 56 Wash. 361, 371-72, 105 P. 840 (1909). The most obvious "volunteer" is the "officious intermeddler"—a stranger to the underlying transaction who is not acting under any legal compulsion or to protect some interest.[12] But courts have debated the precise contours of the term "volunteer" for over half a century.[13]

In the past, this court has sometimes used language suggesting that a party seeking subrogation for a payment it made must have made that payment to satisfy an existing legal obligation or protect an existing interest that was under threat. For example, early in our state's history we stated:

> The right of subrogation under the better rule applies in cases where a party who has an interest in the property and who does not stand as a mere volunteer pays a debt owing in whole or in part by another *to protect his own rights or to save his own property.* The remedy is no longer limited to sureties and quasi sureties, but is freely applied by courts of equity in all cases where good conscience and equity dictate that a debt paid by one *under any sort of legal coercion* ought to be paid by another.

---

[12] *See* Daniel Friedmann, *Unjust Enrichment, Pursuance of Self-Interest, and the Limits of Free Riding,* 36 LOY. L.A. L. REV. 831, 845-47 (2003).

[13] "All courts subscribe to the rule that subrogation will not be permitted a mere 'volunteer.' But there is no general agreement as to the personification of the word." Note, *Subrogation of Purchaser to Rights of Senior Mortgagee against Junior Encumbrances,* 48 YALE L.J. 683, 686 (1939) (footnote omitted).

*Murray,* 56 Wash. at 371-72 (emphasis added). Fifty years later, relying in part on

the *Murray* case, we similarly stated:

> Appellant does not fall within the rationale of the rule because her right to live in the house, if we indulge the presumption that it constituted an interest in the property, *was never threatened by the grantor and her advancement of the down payment could not have been made for the purpose of protecting it.* She acted freely and without compulsion. She was a volunteer.

*Goodrich v. Fahey,* 55 Wn.2d 692, 694, 349 P.2d 729 (1960) (emphasis added).

More recently, in *BNC Mortgage, Inc. v. Tax Pros, Inc.,* 111 Wn. App. 238,

254, 46 P.3d 812 (2002), the Court of Appeals ruled that to avoid the volunteer bar,

a party must pay to protect a preexisting interest or to satisfy a legal obligation. It

therefore concluded that equitable subrogation was unavailable to a refinancing

lender because the lender "did not act under any . . . duty or compulsion, but

instead chose freely and voluntarily to avail itself of a business opportunity." *Id.*

These cases have sometimes labeled the doctrine barring intermeddlers from

benefitting from equitable subrogation the "volunteer rule." The context in which

the cases have used the rule suggests a strict interpretation of the term "volunteer"

—that "everyone [is] a volunteer who was not in the position of a surety or who

did not have some previous interest to protect in the subject matter in question."[14]

---

[14] Note, *supra,* at 686. This perspective is in the minority, but it is a well-established minority. *See generally id.*

However, in the context of mortgage refinancing, this court has generally permitted a lender to be subrogated to the position of a priority interest holder simply by paying off that priority interest holder's loan. *E.g., Spokane Sav. & Loan Soc'y v. Park Vista Improvement Co.*, 160 Wash. 12, 27, 294 P. 1028 (1930); *Prestance*, 160 Wn.2d 560. In these cases we have not required any preexisting interest or legal obligation.

We recognize the tension between the rule that a subsequent lender may be equitably subrogated to the interest of a prior lender simply by paying off the prior lender and the rule that a party may not obtain equitable subrogation unless it acted to protect a preexisting, threatened, interest or to fulfill a preexisting legal obligation. In the refinancing context a lender often acts for future profit, rather than to protect a preexisting, threatened, interest or to fulfill a preexisting legal obligation. As *BNC Mortgage* makes clear, a lender may instead be acting "freely and voluntarily to avail itself of a business opportunity." *BNC Mortg.*, 111 Wn. App. at 254.

    c. *The Treatment of the Volunteer Rule in* Restatement (Third) *§ 7.6*

*Restatement (Third)* § 7.6 recognizes the tension between a strict volunteer rule and equitable subrogation in the mortgage priorities context. It has expressly addressed the problem by rejecting the strict volunteer rule and adopting the "protect some interest" rule instead:

11

Prior case law has often indicated that one who pays as a "volunteer" is not entitled to subrogation. However, the meaning of the term "volunteer" is highly variable and uncertain, and has engendered considerable confusion. This *Restatement* does not adopt the "volunteer" rule, but instead requires simply that the subrogee pay to protect some interest.

RESTATEMENT (THIRD) § 7.6 cmt. b. *Restatement (Third)* § 7.6 then defines "interest" broadly to cover even lenders who do not have an existing interest in the property at issue:

[U]nder this section, the subrogee must have performed in order to protect an "interest," but that interest need not be a legally recognized interest in real property. It may be, for example, a business or financial interest that would be impaired by foreclosure of the mortgage, an interest in reputation, or a moral obligation.

*Id.* Whatever tensions traditional interpretations of equitable subrogation have engendered, *Restatement (Third)* § 7.6 resolves them with the rule that "one who performs a mortgage is entitled to subrogation in order to avoid unjust enrichment." *Id.* cmt. a.

d. *This Court Now Adopts* Restatement (Third) *§ 7.6*

This court recently adopted the liberal approach of *Restatement (Third)* § 7.6 in *Prestance*. Specifically, *Prestance* addressed whether "a party is barred from seeking relief [via equitable subrogation] whenever he has actual knowledge of the intervening interests." *Prestance,* 160 Wn.2d at 566. We considered three different approaches:

First, the *Restatement* approach that says actual or constructive knowledge of intervening interests is irrelevant; second, a minority approach that says a plaintiff with either actual or constructive knowledge cannot seek equitable subrogation; and third, a "majority" approach that says a plaintiff with actual knowledge cannot seek equitable subrogation, while one with constructive notice can.

*Id.* (emphasis and footnote omitted). The question in *Prestance* was strictly about knowledge of intervening interests. We expressly adopted *Restatement (Third)* § 7.6 but only for the purposes of resolving the knowledge question. *Id.* at 582 ("We adopt § 7.6 of the *Restatement (Third)* and hold WFB West is equitably subrogated to Washington Mutual's first-priority lien, regardless of either its actual or constructive knowledge of intervening interests."). We did not expressly consider the volunteer rule.

Based on *Prestance*, the Court of Appeals in this case held that the volunteer rule no longer applies in Washington:

Volunteer Rule

Newman Park further argues that equitable subrogation does not apply because Columbia was a volunteer.

Previously, we recognized the volunteer rule in the context of a commercial loan. *BNC Mortg., Inc.*, 111 Wn. App. at 254. After our decision in *BNC Mortgage, Inc.*, 111 Wn. App. 238, 46 P.3d 812, the Washington Supreme Court considered the volunteer rule in [*Prestance*], 160 Wn.2d 560. In [*Prestance*], the court held that equitable subrogation was available in the refinance context and, as previously discussed, adopted *Restatement (Third) of Property: Mortgages* § 7.6, which rejects the "volunteer" rule. [*Prestance*], 160 Wn.2d at 560-64. And our Supreme Court did not limit its adoption of

the *Restatement* or attempt to preserve the volunteer rule. We now conclude that the volunteer rule is no longer a defense where a mortgagee pays off another mortgage holder. We therefore affirm the order granting partial summary judgment to Columbia on the basis of equitable subrogation.

*Columbia Cmty. Bank v. Newman Park, LLC,* 166 Wn. App. 634, 645, 279 P.3d 869 (2012).

But because we did not explicitly "consider[ ] the volunteer rule" in *Prestance,* the parties contest this holding. Newman Park argues that the *BNC Mortgage* opinion stated the correct view of the law in Washington—that a later lender without an existing interest or legal obligation who pays off a prior lender is a volunteer and barred from equitable subrogation. Newman Park concludes that CCB was a volunteer and cannot be subrogated to HNB's interest. In contrast, CCB argues that *Prestance* implicitly approved *Restatement (Third)* § 7.6's rejection of the strict volunteer rule.

We now explicitly adopt *Restatement (Third)* § 7.6 in full.[15] We have already adopted large portions of *Restatement (Third)* § 7.6. As we said in

---

[15] *Restatement (Third)* § 7.6 states:

> (a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

14

*Prestance*, albeit in a slightly different context, "[The] trend is clearly toward the more liberal approach, and we would be wise to follow it." *Prestance*, 160 Wn.2d at 576. We gave two policy reasons why a liberal approach to equitable subrogation was desirable. First, we noted that "by facilitating more refinancing, [liberal application of] equitable subrogation helps stem the threat of foreclosure." *Id.* at 580. Second, we asserted that "a liberal equitable subrogation doctrine can save billions of dollars by reducing title insurance premiums" and that those premiums would be passed on to homeowners. *Id.* at 580-81. Maybe the effect of liberalizing equitable subrogation on promoting these policies was overstated. Still, the *Restatement (Third)* § 7.6 approach is the more simple and clear approach. It is most consistent with our recent prior case law and also remains an effective way of preventing true intermeddlers from benefitting from an equitable remedy. Indeed, the result in *Prestance* would have been the opposite if we had applied a

---

(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:
    (1) in order to protect his or her interest;
    (2) under a legal duty to do so;
    (3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or
    (4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.

15

strict version of the volunteer rule in that case. To the extent that *BNC Mortgage* suggested that the volunteer rule generally bars equitable subrogation in the refinance context, it is overruled.

e. *Application of* Restatement (Third) *§ 7.6 to This Case*

Our adoption of *Restatement (Third)* § 7.6 does not change the fact that equitable subrogation remains "an equitable remedy." RESTATEMENT (THIRD) § 7.6 cmt. a. As such, it is "founded in the facts and circumstances of each particular case." *Credit Bureau Corp. v. Beckstead,* 63 Wn.2d 183, 186, 385 P.2d 864 (1963). From ancient times, "[t]he first maxim in equity" has been that one 'who seeks equity must do equity.'" *People's Sav. Bank v. Bufford,* 90 Wash. 204, 208, 155 P. 1068 (1916) (italics omitted). Of similarly ancient provenance is the requirement that those "'who come[ ] into equity must come with clean hands.'" *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.,* 96 Wn.2d 939, 949, 640 P.2d 1051 (1982).

In this case, CCB arguably failed to exercise due diligence when it loaned Sturtevant $1.5 million without an in-depth investigation into his claimed assets. But there is no question that Sturtevant altered the Newman Park operating documents he submitted to CCB in support of his loan application to make it appear that he was the sole owner of Newman Park. Indeed, the trial court declared that the deed of trust Sturtevant gave to CCB was invalid in part because

"the bank [CCB] was operating with a forged document." Report of Proceedings (Apr. 15, 2010) at 78. *Restatement (Third)* § 7.6 expressly lists "misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition" as situations in which equitable subrogation is warranted. RESTATEMENT (THIRD) § 7.6(b)(3). Thus, under *Restatement (Third)* § 7.6(b)(3), Sturtevant's deceit makes equitable subrogation especially appropriate here.[16]

In fact, *Restatement (Third)* § 7.6's comment d addresses "[p]erformance induced by fraud and the like":

> In some cases one may be induced to perform and discharge a mortgage obligation by misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition. The deception may be practiced on the payor by the mortgagor or by some other person. If the circumstances are such that subrogation to a prior mortgage will relieve the payor, and *if no prejudice to any innocent person will result*, the payor may have subrogation.

(Emphasis added.) This comment compels the same conclusion. CCB may have been less than diligent when it gave Sturtevant a loan with apparently minimal investigation. But granting equitable subrogation here would not result in any prejudice to Newman Park because it retains exactly the same position it would have had if CCB had never paid its loan—it owes a debt of approximately $400,000. The only change is the identity of the party owed.

---

[16] The parties in this case both stated at oral argument that the record in this case is factually complete. This court can therefore balance these equitable considerations of deception and due diligence to resolve whether summary judgment equitably subrogating CCB to HNB's interest was appropriate in this case.

The fact that Sturtevant presented forged documents to CCB, along with the fact that no prejudice to anyone will result, makes equitable subrogation particularly appropriate here. We hold that under the circumstances of this case, the trial court properly granted CCB's motion to be equitably subrogated to HNB's interest.

## CONCLUSION

Some past equitable subrogation cases in Washington contain language suggesting support for a strict version of the volunteer rule. A strict volunteer rule would bar commercial lenders like CCB from obtaining equitable subrogation in most circumstances. *Restatement (Third)* § 7.6 applies a more liberal approach that permits lenders like CCB to benefit from equitable subrogation in the mortgage refinance context. This court recently expressly adopted *Restatement (Third)* § 7.6's liberal approach to equitable subrogation, albeit in a different context where we did not consider the volunteer rule. We now expressly reject the volunteer rule and adopt *Restatement (Third)* § 7.6 in full. Under *Restatement (Third)* § 7.6, equitable subrogation is available in the mortgage refinance context and it is especially appropriate where the potential subrogee's payment is induced by deceit or fraud. That is just what happened here. We affirm the Court of Appeals.

_____
George McCloud, J.

WE CONCUR:

_____
Madsen, C.J.

_____

_____

_____
Fairhurst, J.

_____
Stephens, J.

_____
Wiggins, J.

_____
González, J.

_____
Leach, J.P.T.