IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BRIAN A. WORDEN and ANNE MEREDITH WORDEN, husband and wife, | ) ) ) ) | No. 30401-9-III (consolidated with No. 30885-5-III) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JAMES M. SMITH and JANE A. SMITH, husband and wife, | ) ) ) | |
| Defendants, | ) ) | |
| COLUMBIA BANK, a banking corporation, and SAALFELD GRIGGS, PC, | ) ) ) ) | |
| Appellants, | ) ) | |
| KAL FARMS, LLC, and GRANITE FARMS, LLC, | ) ) ) | PUBLISHED OPINION |
| Respondents. | ) ) | |

SIDDOWAY, A.C.J. — Brian and Anne Worden's foreclosure on property

mortgaged to them by James and Jane Smith led to a predictable and error-free outcome

for the Wordens and Smiths, but embroiled four other parties in disputes leading to this

appeal. A bidding war for the property at the foreclosure sale resulted in a high price and

surplus proceeds that were paid out to the wrong recipients as provided by an order prepared by Columbia Bank, a junior lienholder. After the bank realized it had received almost $66,000 less than the amount to which it was entitled, it first sought an amendment to the distribution order and later sought to correct the error through a request for equitable relief when the property was redeemed.

The circumstances presented the trial court with an unusual problem and no easy solution, but the court erred in concluding that the law of the case doctrine or the stipulated character of the order prevented it from granting the relief requested by the bank. We reverse the trial court's decisions on both orders challenged on appeal and remand with directions to enter an order imposing an equitable lien on the property in favor of the bank's assignee.

FACTS AND PROCEDURAL BACKGROUND

In December 2010, Brian and Anne Worden commenced the action below against James and Jane Smith, seeking to recover over $650,000 owed by the Smiths on a promissory note and to foreclose a mortgage on property securing the note. Among relief requested by the Wordens was that the court determine that their mortgage was a valid first lien on the Smiths' property, senior to a deed of trust later granted to Columbia Bank.

2

The superior court granted the relief requested by the Wordens, entering a money judgment of $894,762.17 in their favor. It ordered that their mortgage be foreclosed and the property sold with the proceeds to be applied first to the amount owed to them.

At the sheriff's sale of the property in August, there were competing bidders. The property was ultimately sold to KAL Farms LLC and Alan Mehlenbacher (collectively KAL Farms) for a bid price of $1,625,000. After paying amounts owed the Wordens, surplus proceeds of $710,780.28 remained and were deposited by the sheriff with the clerk of the superior court.

Columbia Bank then filed a motion for an order "directing the [clerk of court] to distribute all surplus sales proceeds pursuant to RCW 61.12.150." Clerk's Papers (CP) at 190. RCW 61.12.150 dictates how the proceeds of a foreclosure sale should be applied. At the time of the motion, the parties to the foreclosure action were the Wordens (the creditors), the Smiths (the debtors), and Columbia Bank (the junior lienholder).

The bank's motion was unopposed. Before the time set for hearing on the motion, the bank's lawyer circulated to the parties a proposed form of order that made three references to the proposed distribution as being "pursuant to" or "required under" RCW 61.12.150. CP at 245-47. The Wordens and Smiths agreed to the proposed order, which, in its final form, was jointly presented by lawyers for the bank and the Wordens at the time set for hearing and was entered by the court.

3

Beyond describing the proposed distribution as being required by statute, the order

went on to spell out who would receive the proceeds and in what amount. It stated that

the proceeds would be distributed:

(1)  First, towards outstanding real property taxes due and owing upon the Property, said real property taxes totaling approximately $65,625.73 . . . ;

(2)  Second, towards outstanding storm water taxes totaling approximately $287.64 . . . ;

(3)  Third, towards full satisfaction of [the Wordens'] judgment against Defendants James M. Smith and Jane A. Smith, said judgment totaling, as of September 20, 2011, the sum of $933,311.39 . . . ;

(4)  Fourth, all remaining proceeds, said proceeds totaling approximately $625,775.24, to be distributed to [Columbia Bank] in partial satisfaction of the sums owing to it, as required under RCW 61.12.150.

CP at 246-47. In accordance with the order, property taxes and storm water taxes in the

amounts indicated were paid to the county treasurer and $625,775.24 was paid to the

bank.

The bank soon realized that it had made a mistake in providing that taxes should

be paid from the proceeds. Within 10 days of the original order, it filed a motion to

amend the order on grounds provided by CR 59(h) or, in the alternative, CR 60(b). Its

motion explained that the bank's lawyer mistakenly believed that because property taxes

were a higher priority lien[1] they must be satisfied before other distributions, and that in

---

[1] The lien on real property for taxes and levies that are lawfully imposed or assessed is imposed by former RCW 84.60.010 (1969), which provides in part:
The said lien shall have priority to and shall be fully paid and satisfied

4

providing for a priority payment of taxes the order was "a mistake in contravention of RCW 61.12.150 and should be corrected accordingly." CP at 255.

In response to the motion, KAL Farms, though not earlier a party to the foreclosure action, filed a notice of appearance and objected to the bank's motion. It argued that because the order directing distribution was an agreed order, the court should not entertain any motion to amend. The trial court considered KAL Farms's objection and allowed it to participate in the hearing on the bank's motion. It would later observe that although KAL Farms had not been a party at the time the order directing distribution was circulated, at least one version of the bank's proposed order directing distribution had been provided to KAL Farms's lawyer for approval.

During the hearing, the following exchange occurred between the court and KAL Farms's lawyer:

> THE COURT: Okay, Ms. Geidl, why do you think I shouldn't amend the order? You didn't rely on the fact that taxes were going to— excuse me—your client didn't rely on the fact that these taxes were going to get paid from the sale proceeds, did he?
> MS. GEIDL: No, but they, I believe the proceeds have already been distributed. . . .

---

before any recognizance, mortgage, judgment, debt, obligation or responsibility to or with which said real and personal property may become charged or liable.

As one author has observed, "Despite the statute's apparent mandate, the priority of the tax lien only truly has an effect when private rights are asserted against [a] tax deed." Randall Thomsen, *Washington State Property Tax Foreclosures: Quoerere Dat Sapere Quoe Sunt Legitima Vere*, 32 GONZ. L. REV. 123, 142 (1996-97).

> . . . [T]his was a stipulated order, and it was actually pushed by [Columbia Bank] and it was submitted on their counsel's pleading paper, and they were pretty adamant about the order and [its] verbiage. The parties all agreed, and to amend it now is, I believe, unjust, because all of the proceeds had been distributed.

Report of Proceedings (Oct. 17, 2011) (RP) at 9-10.

The court took the matter under advisement and thereafter issued a written opinion. Accepting arguments that had been made by KAL Farms, it explained its decision to deny the motion, stating:

> The Order of September 19, 2011, became the law of the case when entered. While not consistent with RCW 61.12.150, it is not an improper or illegal order, and was in fact a product of discussion among the parties as well as the purchaser at the sale. The Court under these circumstances does not find sufficient grounds under either CR [5]9 or CR 60 or case law to "correct" the order previously entered, and [Columbia Bank's] motion to amend is denied.

CP at 307. The bank timely appealed.

While this first appeal was pending, and approximately seven months after the foreclosure sale, Granite Farms LLC, an assignee of the Smiths' redemption rights, filed a notice of redemption. Its notice, dated March 21, 2012, asked that the redemption be effective on March 27, at which point it proposed to make payment to the sheriff of $1,747,215.47, representing the bid amount of $1,625,000 plus 12 percent interest on that amount from the date of the foreclosure sale through March 27. In calculating the redemption amount, it recognized that any taxes paid by KAL Farms (together with

6

interest thereon) should also be included under the applicable statute, RCW 6.23.020, but it noted that no taxes had been paid.

KAL Farms evidently perceived the redemption as an opportunity to correct the error earlier made by the bank and resolve the bank's pending appeal, in which relief might be ordered against it. On March 29, Mr. Mehlenbacher signed a "Notice of Payment of Taxes" pursuant to RCW 6.23.050, a statute that provides that a redemptioner must reimburse any taxes paid during the redemption period if it receives a proper form of notice of the payment before it redeems.[2] CP at 359. The notice characterized the $1,625,000 paid by KAL Farms and Mr. Mehlenbacher at the foreclosure sale as having paid "$65,625.73 . . . for outstanding real property taxes due and owing, and $287.64 . . . for outstanding storm water taxes"—amounts that should therefore be included in the redemption price for the property. *Id.* Granite Farms, which had not yet paid the redemption price or received a certificate of redemption immediately objected, filing a second notice of redemption directed to the county treasurer with which it enclosed and

---

[2] RCW 6.23.050 provides:
A purchaser or redemptioner who pays any taxes or assessments . . . must file a statement thereof, for recording, with the recording officer of the county in which the property is situated before the property has been redeemed from him or her. Otherwise, the property may be redeemed without paying such tax, assessment, or lien, but if actual notice of such payments or liens has been given to the person who redeems, failure to file the statement shall not affect the right to payment from that person absent that person's demonstration of prejudice resulting from the failure to file the statement.

tendered its check for $1,747,215.47 and denied that any amount beyond that was due and payable.

The following week, KAL Farms filed what it called a "Motion to Pay," asking that the superior court set a redemption price for the property that would include not only the amount of KAL Farms's bid at foreclosure and interest but also the taxes paid with the foreclosure proceeds. CP at 345-46.

By this time, Saalfeld Griggs PC, the law firm that represented the bank in the foreclosure sale, had been assigned the bank's interest in any claim to recover the taxes that had been paid in error. The law firm joined in KAL Farms's motion. It argued that the court should look to principles of equity to prevent Granite Farms from receiving a windfall and apply the doctrines of unjust enrichment and equitable subrogation to add the taxes and assessments paid from the surplus proceeds, together with interest, to Granite Farms's redemption price.

Granite Farms then moved to intervene in order to oppose KAL Farms's and the law firm's motion. Its motion was supported by the declaration of Brad Smith, as managing member, arguing that KAL Farms's motion "is simply an attempt at interfering with my right to redeem the property in hopes of keeping the property for itself." CP at 385.

The superior court denied the motion to pay, rejecting KAL Farms's and the law firm's request that it add taxes paid out of the surplus proceeds to Granite Farms's

8

calculation of the redemption price. The bank and the law firm appealed. Their motion to consolidate this second appeal with the bank's earlier appeal was granted.

Given the common interests of the bank's and the law firm's interests in the appeal, we hereafter refer to the two appellants collectively as "the bank."

## ANALYSIS

### *A. Ordinary Significance and Effect of Foreclosure on Senior Liens*

We begin our review of the bank's assignments of error by summarizing the ordinary significance of a foreclosure on senior liens such as the real property taxes and assessments paid out of surplus proceeds here, as a result of the bank's error.

It is a fundamental principle of mortgage law that a valid judicial foreclosure of a senior mortgage extinguishes all *junior interests* whose holders were named as defendants. *U.S. Bank of Wash. v. Hursey*, 116 Wn.2d 522, 526, 806 P.2d 245 (1991); RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.1 cmt. a (1997). It is equally fundamental that the title of the purchaser at a foreclosure sale will be subject to all mortgages and other interests that are *senior* to the mortgage being foreclosed. RESTATEMENT (THIRD) OF PROPERTY § 7.1 cmt. a; *see also* 28 MARJORIE DICK ROMBAUER, WASHINGTON PRACTICE: CREDITORS' REMEDIES—DEBTORS' RELIEF § 7.61 (1998) ("If other creditors have liens on real property sold on execution, senior liens continue after the sale, but junior liens are extinguished.").

9

Senior lienors have no lien claim to junior foreclosure surplus. As explained by the *Restatement (Third) of Property*,

> Unlike their junior lien counterparts, [senior lienholders'] liens are unaffected by foreclosure and remain on the foreclosed real estate. They remain free to foreclose on the real estate, and thus there is no justification for transferring any part of their liens to the junior foreclosure surplus. This is true even where obligations secured by senior liens are in default.

§ 7.4 cmt. c.

Stated differently,

> [T]he lien of the junior encumbrancers cannot follow the land because they are parties to the record and the [foreclosure] decree cuts them off from the land, but for that very reason their rights may be asserted against the surplus fund in court.

1 GARRARD GLENN, MORTGAGES, DEEDS OF TRUST, AND OTHER SECURITY DEVICES AS TO LAND § 86.3, at 520 (1943); *accord United States v. Sage*, 566 F.2d 1114, 1114-15 (9th Cir. 1977) ("Foreclosure affects the rights of all mortgagees junior to the foreclosing mortgagee and requires them to look to the proceeds for satisfaction, but it has no effect whatsoever upon the interest of senior mortgagees.").

RCW 61.12.150 reflects these principles. It provides that the proceeds of a foreclosure sale shall be applied first to the payment of the amount due on the mortgage being foreclosed (principal, interest, and residue) and to foreclosure costs. In cases where the proceeds of the sale are more than sufficient to pay the amount due and costs, "the surplus shall be applied to all interests in, or liens or claims of liens against, the property

*eliminated by sale under this section* in the order of priority that the interest, lien, or claim attached to the property. Any remaining surplus shall be paid to the mortgage debtor, his or her heirs and assigns." RCW 61.12.150 (emphasis added).

Here, as recognized by the comments to the *Restatement*, it was the bank, whose junior lien against the property was being eliminated, who needed the surplus proceeds. The county, whose tax lien would continue and could be collected from the property, had no such need.[3] Delinquent amounts owed the county could be collected by foreclosing on the property in the hands of the redemptioner, relying on the undiminished priority of the county's lien. Washington counties bring omnibus tax foreclosure proceedings every year against properties whose payment of real property tax is three years in arrears. *See* RCW 84.64.050.

Given the fact that senior liens follow the property, the *Restatement* observes that "in calculating an appropriate foreclosure bid a prospective purchaser should subtract any senior liens from the fair market value of the real estate." RESTATEMENT (THIRD) OF PROPERTY § 7.1 cmt. a. Indeed, if a junior lienholder forecloses and is concerned about the amount of senior liens to which it will be subject, it may make the holders of senior liens parties to a judicial foreclosure action for the limited purpose of determining the

---

[3] We assume that the storm water taxes were themselves a lien attaching to the property. Our opinion should be understood as treating them interchangeably. *See* RCW 36.94.150 (county lien for delinquent charges).

amount of those liens and making an intelligent decision how much to bid. *See id.*; 5 HERBERT THORNDIKE TIFFANY, THE LAW OF REAL PROPERTY § 1536 (Basil Jones 3d ed. 1939) (the holder of a senior lien "may be made a party merely to obtain an adjudication as to the amount of his lien, in order that the purchaser may be advised of what he is purchasing").

Accordingly, and as no party disputes, the error in the bank's proposed order distributing proceeds made a difference. It resulted in the bank receiving almost $66,000 less than the amount to which it was entitled under RCW 61.12.150. The purchasers—first KAL Farms, and later Granite Farms—were relieved of almost $66,000 in tax liabilities that would ordinarily have followed the property into their hands. The parties' dispute on appeal is not over whether the bank received substantially less than it was due by statute or whether whoever purchased the property received a windfall, it is over whether either of the bank's two efforts made to correct the error should have been granted by the trial court.

### B. *Denial of the Bank's Motion To Amend Under CR 59(h) and CR 60(b)*

The bank assigns error first to the trial court's denial of its motion to amend the order directing distribution of the proceeds.

CR 59(h) authorizes the trial court to alter or to amend a judgment if a motion is brought within 10 days after its entry. CR 59(a) identifies nine grounds supporting reconsideration. A court may likewise relieve a party from a final judgment on the

motion of an aggrieved party pursuant to CR 60, which "is the appropriate device to amend a judgment after the time has elapsed under CR 59(h)." *Seattle-First Nat'l Bank v. Treiber*, 13 Wn. App. 478, 480-81, 534 P.2d 1376 (1975). The bank's motion under CR 59(h) was timely, so we consider only CR 59 as a basis for relief.

We review a trial court's grant or denial of a CR 59 motion for abuse of discretion. *Lian v. Stalick*, 106 Wn. App. 811, 823-24, 25 P.3d 467 (2001) (citing *Kohfeld v. United Pac. Ins. Co.*, 85 Wn. App. 34, 40, 931 P.2d 911 (1997)). A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Rivers v. Wash. State Conference of Mason Contractors*, 145 Wn.2d 674, 684, 41 P.3d 1175 (2002). A court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law. *State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008). We review alleged errors of law de novo. *State v. Bunker*, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010).

### 1. *Law of the Case*

According to the bank, the trial court erred in declining to exercise its discretion under CR 59(h) because it erroneously believed that it lacked discretion in light of the doctrine of "Law of the Case." Appellant's Br. at 7. In tying the court's error to misapplication of law of the case, the bank points to the trial court's statement in denying the motion that "[t]he Order of September 19, 2011, became the law of the case when

13

entered" and that the court "does not find sufficient grounds under either CR [5]9 or CR 60 or case law to 'correct' the order previously entered." CP at 307.

The law of the case doctrine "derives from both RAP 2.5(c)(2) and common law." *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). It "means different things in different circumstances, and is often confused with other closely related doctrines, including collateral estoppel, res judicata, and stare decisis." *Id.* (footnotes and citation omitted). In its "most common form," the law of the case doctrine provides that "once there is an appellate holding enunciating a principle of law, that holding will be followed in subsequent stages of the same litigation." *Id.* Therefore, "'questions determined on appeal, or which might have been determined had they been presented, will not again be considered on a subsequent appeal if there is no substantial change in the evidence.'" *Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988) (quoting *Adamson v. Traylor*, 66 Wn.2d 338, 339, 402 P.2d 499 (1965)).

The law of the case doctrine has no application here. To trigger application of the law of the case doctrine, there must generally be "a prior appellate court decision in the same case." *In re Estate of Jones*, 170 Wn. App. 594, 605, 287 P.3d 610 (2012) (citing *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992)). The doctrine "does not apply to identical issues raised repeatedly before the trial court." *Id.*; *MGIC Fin. Corp. v. H.A. Briggs Co.*, 24 Wn. App. 1, 8, 600 P.2d 573 (1979)

(refusing to extend the doctrine to apply to motions raised several times at the trial court level).

No party on appeal defends the court's refusal to amend the bank's original order based on the law of the case doctrine. To the extent the trial court relied on the law of the case doctrine to refuse to consider the bank's motion to amend, the responding parties implicitly concede, correctly, that the trial court incorrectly applied the law and thereby abused its discretion.

### 2. *Asserted Contract Rights Arising From a Stipulated Order*

Granite Farms argues that the court had an additional, defensible basis for refusing to amend the order directing distribution: that the order was "not an improper or illegal order, and was in fact the product of discussion among the parties as well as the purchaser at the sale." CP at 307. It characterizes the order directing distribution as a stipulated order and likens the facts of this case to *In re Estate of Harford*, 86 Wn. App. 259, 936 P.2d 48 (1997).

*Harford* involved a dispute arising out of the wills of Edith and Delbert Harford, husband and wife, who entered their marriage with children from prior marriages. When Delbert was the first to die, he left a will stating that he and Edith had agreed to leave their property to each other and, upon the survivor's death, in equal shares to all four of their children (three being Edith's; one being Delbert's). Edith had signed Delbert's will, signifying her consent to this mutual agreement clause. But she later executed a will

15

leaving her estate to her three children alone. When she died, the heirs of Delbert's daughter—Edith's stepdaughter—sought to enforce the contract to devise.

The parties engaged in negotiations but reached an impasse, principally over whether the one-fourth share claimed by the contestants should include Edith's inter vivos transfers. While not able to resolve all issues, the parties' negotiations did lead to an agreed plan for administration of the estate that they reduced to a stipulated order entered by the court. The lawyer for Edith's children later moved to vacate the order, claiming that through his oversight the stipulation contained an unagreed provision conceding the contestants' one-quarter claim to the estate. The trial court believed the lawyer's claim that this was an oversight and vacated the order under CR 60(b).

The appellate court reversed. It held that the stipulated order, being a settlement agreement and a contract, could not be vacated on the basis of a unilateral mistake. It observed that Edith's children had not shown a *mutual* mistake, "rather the evidence was contested." *Id.* at 263.

The bank contests the application of *Harford*, arguing that there is no basis in the record to support Granite Farms's implicit suggestion that "there was some unspoken agreement by the parties to not follow the statutory scheme in distributing the sales proceeds and the order was somehow the result of negotiation between the parties." Reply Br. of Appellant at 7. We agree. A stipulation or even an agreed, jointly presented order can embody a contract, but whether it does—and the parties' intent in entering into

16

it—must be determined as with any contract from its language, subject, and objective; the circumstances surrounding formation; the parties' subsequent conduct; and the reasonableness of the parties' interpretations. *Durand v. HIMC Corp.*, 151 Wn. App. 818, 829-30, 214 P.3d 189 (2009).

It appears from the parties' communications here that the objective in circulating the bank's proposed order was to be sure that everyone agreed on the interest calculation and other particular amounts that the parties presumed should be included in the distribution: in short, on factual matters. Unlike in *Harford*, there is literally no evidence that these parties had a dispute over their legal rights and duties under the circumstances that they then "settled" through the agreed order.

The motion and order are themselves evidence of mutual, not unilateral, mistake as to the distribution required by RCW 61.12.150. For example, the bank asserted in its motion for an order that "all surplus proceeds should be distributed to Bank *as mandated by RCW 61.12.150*." CP at 193 (emphasis added). The title of both the motion and the proposed order states that the proceeds are to be distributed "pursuant to" the statute. CP at 190, 215. The agreed order signed and presented by the parties provides, "[P]*ursuant to RCW 61.12.150*, all surplus proceeds . . . after satisfaction of the costs of the sale, outstanding real property taxes and satisfaction of Plaintiffs' judgment . . . shall be distributed to [the] Bank." CP at 215 (emphasis added). The record contains no evidence that any party questioned or disputed the order's consistency with chapter 61.12

RCW. The only rational reading, given these many references to the statute, is that the parties intended to abide by RCW 61.12.150 and did not realize that the order failed to do so.[4]

A stipulation by parties to the law does not bind a trial court or this court. *State v. Drum*, 168 Wn.2d 23, 34, 225 P.3d 237 (2010); *Folsom*, 111 Wn.2d at 261 (characterizing the rule that stipulations of law are not binding as "long-standing"). It is error for a court to treat parties' stipulations to law as binding. *Drum*, 168 Wn.2d at 34.

There was literally no basis from which to conclude that the order directing distribution reflected a settlement. To the extent the trial court refused to consider the bank's motion to amend based on the fact that the order directing distribution was an agreed order, it incorrectly applied the law and thereby abused its discretion.

---

[4] The parties might have had little experience with distributing surplus proceeds under the current statute. Surplus proceeds rarely remain after the foreclosing party's judgment and costs associated with the sale have been satisfied. 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 19.13 (Supp. 2013). Stoebuck & Weaver note, "When that did happen, there was sometimes some confusion as to how the surplus should be distributed" under the former version of the statute, which "appeared to call for a distribution to the mortgagor ahead of any junior liens on the property." *Id.* § 19.13 & n.3. Even the trial court commented at the hearing on the motion to amend that "it used to be . . . when you had surplus funds it was first in time whoever ran to the courthouse first, including the debtor could make [a] claim." RP at 10-11. The legislature sought to clarify the way in which the surplus should be distributed with the current RCW 61.12.150. STOEBUCK & WEAVER, *supra*, at § 19.13.

### 3. *Reconsideration Was Warranted*

The bank argued in the trial court that grounds to amend existed under CR 59(a)(6), (7), (8), and (9). RP at 7. The grounds provided by subsections (7) and (9) both apply. A motion for reconsideration may be granted under CR 59(a)(7) where there is no evidence or reasonable inference from the evidence to justify the decision or where the decision is contrary to law. Reconsideration may be granted under CR 59(a)(9) where substantial justice has not been done.

Here, the payments provided by the order directing distribution were contrary to the application of surplus proceeds required by RCW 61.12.150. The erroneous distribution had significant monetary consequences for the parties. Relief was warranted under CR 59.

By the time the bank's motion to amend was heard, the surplus proceeds had already been applied to the county taxes. Since liability for real property taxes is not a personal liability, we conclude that the appropriate relief was an order imposing an equitable lien in the bank's favor against the property acquired by KAL Farms.

### 4. *Jurisdiction Over KAL Farms*

We cannot dispose of the bank's appeal of the decision on its motion to amend without addressing KAL Farms's argument that we lack jurisdiction over it because it was never made a party to the underlying action and it is not an indispensable party under CR 19. Personal jurisdiction is a question of law, which we review de novo.

19

*Ledgerwood v. Lansdowne*, 120 Wn. App. 414, 422, 85 P.3d 950 (2004) (citing

*Subcontractors & Suppliers Collection Servs. v. McConnachie*, 106 Wn. App. 738, 741,

24 P.3d 1112 (2001)).

"Jurisdiction of the person must be acquired by the service of the applicable

statutory process, or by the voluntary appearance of the party whose rights are sought to

be adjudicated." *State ex rel. Bogle v. Superior Court for King County*, 63 Wash. 96,

100, 114 P. 905 (1911). A party can consent to personal jurisdiction in an action by

taking action that fairly invites the court to resolve a dispute between it and another party.

*See Sec. & Exch. Comm'n v. Ross*, 504 F.3d 1130, 1148 (9th Cir. 2007). Stated

differently, a party waives the claim of lack of personal jurisdiction by "consent[ing],

expressly or impliedly, to the court's exercising jurisdiction." *In re Marriage of Steele*,

90 Wn. App. 992, 997-98, 957 P.2d 247 (1998).

KAL Farms took several actions in the action below any one of which would have

sufficed as consent to personal jurisdiction. It filed a general notice of appearance. It

filed an objection to Columbia Bank's motion to amend and persuaded the trial court to

deny it, leading to the first appeal. It filed a motion to pay in which it affirmatively

requested relief, asking that the trial court set the redemption price for the property to

include the amount of the taxes paid out of surplus proceeds.

Since KAL Farms appeared and consented to jurisdiction, it was not required to be

served with a summons or complaint. The only authority it cites suggesting that it should

have been served is *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451 (5th Cir. 1971), which held that a bank domiciled in Calcutta, India could not be brought into a lawsuit pending in the southern district of Georgia without proper service—and that its lawyer's limited, special appearance in the action to challenge jurisdiction did not change that fact. The case is clearly distinguishable.

Finally, CR 19 has no application. CR 19 deals with persons who are not participating in an action, who should participate in order to ensure a just adjudication, and who therefore should be joined if feasible. KAL Farms did not need to be joined. It appeared on its own, in August 2011, before the two trial court decisions in which it played an instrumental role and that are challenged in this appeal. It participated by consent.

### C. Rejection of the Bank's Arguments That KAL Farms's Motion to Pay Should Be Granted Based on Principles of Equity

The bank's second assignment of error is to what it characterizes as the trial court's summary rejection of its arguments that Granite Farms's redemption price for the property should be increased by the amount of the taxes paid in error out of the surplus proceeds. Although admitting that "the statutory provisions governing the calculation of the redemption price do not provide for repayment of a lien mistakenly paid out of priority at the time of foreclosure," the bank argued that the court should nevertheless

21

"look to principles of equity to prevent the redemptioner from receiving a windfall as a result of an error at the time of foreclosure." CP at 367.

In denying KAL Farms's motion to pay, the trial court repeated its reasoning that the distribution provided by the order had been duly entered and became the law of the case, characterized the bank as simply renewing its argument of mistake, and "decline[d] to revisit the issue." CP at 423-24. As to unjust enrichment and equitable subrogation, the trial court stated only that "[t]he Court also finds that the doctrines of unjust enrichment and/or equitable subrogation do not apply." *Id.* at 424.

Equitable subrogation "includes every instance in which one person . . . has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter." 73 AM. JUR. 2D *Subrogation* § 5 (2013). "'Subrogation applies in many contexts, and while the overall purpose of preventing unjust enrichment is the same, many times the requirements will be tailored to the particular nuances of the situation.'" *Columbia Cmty. Bank v. Newman Park, LLC*, 177 Wn.2d 566, 574 n.7, 304 P.3d 472 (2013) (quoting *Bank of Am., NA v. Prestance Corp.*, 160 Wn.2d 560, 576, 160 P.3d 17 (2007)). The purpose of the doctrine is "'to avoid a person's receiving an unearned windfall at the expense of another.'" *Prestance*, 160 Wn.2d at 567 (quoting RESTATEMENT (THIRD) OF PROPERTY § 7.6 cmt. a). In its most recent decision dealing with equitable subrogation, our Supreme Court observed that

22

"Washington courts embrace a long and robust tradition of applying the doctrine of equity." *Newman Park*, 177 Wn.2d at 569.

It is a general principle of restitution that "[m]istaken performance of another's obligation gives the performing party a claim in restitution against the obligor to the extent of the benefit mistakenly conferred on the obligor." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 7 (2011). Where, as here, the use of a claimant's funds to discharge a lien confers an unintended benefit, the claimant is entitled to restitution via subrogation to the discharged lien as necessary to prevent unjust enrichment. *Id.* § 8; *Olson v. Chapman*, 4 Wn.2d 522, 531-32, 104 P.2d 344 (1940) (discussing common law equitable protection, through subrogation, for one who pays another's taxes and Washington's extension of the protection to cases of payment by mistake). Where liability in restitution merely substitutes one creditor for another, the restitution defendant is not prejudiced by the claimant's mistaken intervention. RESTATEMENT (THIRD) OF RESTITUTION § 8 cmt. b.

Granite Farms argues against the relief requested by the bank on the basis that it should not be forced to "shoulder the burden of the Smiths' debts." Br. of Intervenor/Resp't at 8. The property taxes paid out of the surplus proceeds were not a personal debt of the Smiths. They were a liability in rem that followed the land deeded to Granite Farms by the Smiths.

In *Timber Traders, Inc. v. Johnston*, 87 Wn.2d 42, 47, 548 P.2d 1080 (1976)

23

(quoting *Puget Sound Power & Light Co. v. Cowlitz County*, 38 Wn.2d 907, 920, 234

P.2d 506 (1951) (Finley, J., dissenting)) the Washington Supreme Court explained:

> "In the state of Washington, the only way in which [unpaid] taxes on realty
> may be collected is by the assertion of a lien on the land itself. Rem. Supp.
> 1943, § 11265 . . . [now RCW 84.60.020]. The lien follows the land, and if
> the owner on the tax day chooses subsequently to sell or otherwise dispose
> of his property, there is no way in which he may personally be held
> responsible at the time of levy."

(First and third alterations in original.) "The tax . . . creates a burden on the property

alone." *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502

U.S. 251, 266, 112 S. Ct. 683, 116 L. Ed. 2d 687 (1992).[5]

The facts and circumstances support a right on the part of the bank to be equitably

subrogated to the county's lien for taxes and storm water assessments "against the

interest of any person justifiably obligated to pay those taxes." *Olson*, 4 Wn.2d at 531.

Its claim for equitable subrogation arose first against KAL Farms, but once the property

was redeemed it exists against Granite Farms, which went forward with its redemption

---

[5] We recognize that the bank's deed of trust (which is not in the record) likely included a covenant by the Smiths to keep property taxes current and may have provided that any tax liability paid by the bank to protect its interest would be added to the Smiths' debt to the bank. But we are dubious about Granite Farms's suggestion that the bank's remedy was to sue the Smiths. First, Granite Farms relied for its right to redeem on its status as the successor to the Smiths, having received a quitclaim deed from them. It is in a strange position to be contending that the parties from whom it derived its interest should bear the tax liability. Second, it cites no authority for the proposition that the bank would be entitled to recover from the Smiths for taxes that would have followed the property but for the bank's mistake.

with full knowledge that the taxes had been paid and that the bank had asserted an error and a right to reimbursement.

Since the liability for taxes is in rem rather than personal we conclude that here, too, the appropriate remedy is to impose an equitable lien on the property as was done in *Olson*, in which the appellants were "subrogated to the rights of the county and state." *Id.* at 538. As in *Olson*, the bank—or more precisely here, the bank's assignee—should recover the taxes paid, interest at the legal rate, and the remedy of foreclosure. *See id.*

We reverse the trial court's orders and remand with instructions to enter an order imposing and foreclosing a lien in favor of Saalfeld Griggs PC in the amounts paid for taxes together with interest from the respective dates of payment at the legal rate.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Brown, J.

_____
Kulik, J.

25