# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BRUCE A. WOLF, as Guardian ad Litem for LANA BURKE; ZACHARY BURKE, individually, and ANNA SCOTT, individually, | No. 54598-5-II |
| Respondents/Cross-Appellants, | |
| v. | UNPUBLISHED OPINION |
| GE HEALTHCARE, a subsidiary of General Electric Company; GE MEDICAL SYSTEMS INFORMATION TECHNOLOGIES, INC., a foreign corporation; JEFFERSON COUNTY PUBLIC HOSPITAL DISTRICT NO. 2 d/b/a JEFFERSON HEALTHCARE and UNKNOWN DOES 1-50, | |
| Appellants/Cross-Respondents. | |

MAXA, P.J. – Jefferson County Public Hospital District No. 2 d/b/a Jefferson Healthcare (JHC) appeals a number of trial court decisions following a $23.9 million jury verdict against JHC in favor of Bruce Wolf as guardian ad litem for LB, Anna Scott, and Zachary Burke (collectively the Burkes). The Burkes cross-appeal the court's order to amend the judgment on the jury's verdict to provide for periodic payments of future economic damages under RCW 4.56.260. This appeal arises out of the Burkes' lawsuit alleging that JHC failed to properly monitor their baby daughter LB's heart rate during Scott's labor and delivery and that GE

Healthcare's (GE) electronic fetal heart monitor was defective, causing LB to be born with severe developmental disabilities and other health conditions.

We hold that:

(1) the trial court did not err in changing venue from Jefferson County to Kitsap County;

(2) the trial court did not err in accepting the Burkes' and GE's gender-neutral reasons for using peremptory challenges on male prospective jurors and rejecting JHC's *Batson*[1] challenge;

(3) the trial court did not err in denying JHC's midtrial CR 21 motion to dismiss GE based on a high-low settlement agreement between the Burkes and GE, and JHC cannot raise additional arguments regarding the high-low agreement for the first time on appeal;

(4) the trial court did not err when it precluded JHC's experts from testifying about Scott's family history of genetic abnormalities and seizure disorders and her prenatal marijuana use as possible causes of LB's conditions;

(5) the trial court did not err when it denied JHC's motion for a mistrial based on the Burkes' reference to a 2019 textbook excerpt containing LB's fetal heart strip; and

(6) we decline to consider JHC's argument that the trial judge should have recused herself on the grounds that she allegedly had a special needs child in her family.

Regarding the Burkes' cross-appeal, we hold that (1) the trial court did not err in granting JHC's motion to amend the judgment on the jury verdict to provide for periodic payments of future economic damages under RCW 4.56.260, and (2) RCW 4.56.260 does not violate the Burkes' right to a jury trial, the separation of powers doctrine, or the right to equal protection.

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Accordingly, we affirm the trial court's original judgment on jury verdict and affirm the trial court's order granting JHC's motion to amend the judgment to provide for periodic payments of future economic damages under RCW 4.56.260.

FACTS

*Background*

The Burkes were expecting a baby in January 2014, with Dr. Rachel Bickling as their obstetric provider. Dr. Bickling was a doctor at JHC. The delivery occurred at JHC, a public hospital district located in Jefferson County.

JHC used GE-manufactured electronic fetal heart rate monitors to detect and follow fetal heart rates during labor and delivery. The GE monitor printed out the heartbeat it was tracing, also known as a fetal heart strip. The purpose of an electronic fetal heart rate monitor is to identify when a baby is in distress during labor. One issue that arises with fetal heart rate monitoring is whether the monitor is tracking the mother's or baby's heart rate, which is referred to as maternal heart rate and fetal heart rate confusion. If the monitor is tracking the mother's heart rate, then the person using the monitor would be unaware if the baby was in distress.

*Scott's Labor and Delivery*

In January 2014, Scott was admitted to JHC to give birth. She periodically was hooked up to the GE monitor, and LB had a normal fetal heart rate. Nurses monitored LB's heart rate all day. Nurse Deanna Crawford took over the monitoring that evening. The nurse ending her shift conveyed her concerns to Crawford that the GE monitor possibly was tracing Scott's heartbeat rather than LB's. Crawford testified that she believed that she was monitoring LB's heart rate the entire time before delivery.

When LB was delivered, she was purple and limp. She began experiencing seizures within 12 or 13 hours of being born. While LB still was inside the womb, the umbilical cord had been wrapped around LB's neck, which slowed down her heart rate and decreased the amount of blood flow and oxygenation to her brain. The umbilical cord ultimately caused decreased oxygenation and blood flow to the tissues in LB's body, including her brain.

At the time of trial, LB was almost six years old, but had the mental age of a 12- to 18-month-old. LB had significant developmental and neurological deficits. LB experienced a seizure every few months, which manifested in convulsive activity that lasted between five and 20 minutes. She also suffered spastic quadriplegic cerebral palsy. LB will require 24/7 adult supervision and care for the rest of her life.

*Burkes' Lawsuit*

In October 2016, the Burkes filed a lawsuit against JHC for medical negligence and against GE for product liability in Jefferson County Superior Court. The Burkes alleged that JHC improperly monitored Scott and LB and that GE's monitor mistakenly recorded Scott's heart rate instead of LB's. JHC asserted in its answer an affirmative defense of third-party liability, reserving its right to apportion a percentage of liability to GE.

JHC's answer also provided notice of its intent to request periodic payments under RCW 4.56.260 for any award of future economic damages. JHC later referenced the intent to invoke RCW 4.56.260 in answers to discovery requests.

The case ultimately was assigned to a visiting judge from Kitsap County.

*High-Low Agreement with GE*

In August 2018, the Burkes and GE entered into a proposed high-low agreement, contingent on trial court approval. Under the proposed agreement, GE would owe the Burkes $1

4

million if the percentage of fault allocated to GE was 10 percent or less, and GE would owe no more than $5 million if the jury found that GE was between 10 percent and 100 percent at fault. If GE was allocated a percentage of fault between 10 percent and 100 percent, it would pay proportionally up to the $5 million maximum. In addition, the agreement stated that GE "will get a credit or offset of up to $500,000 for any funds paid on behalf of [JHC] that will be applied to satisfy GE Healthcare's obligations under this Proposal." Clerk's Papers (CP) at 3979. The agreement did not release GE from liability.

The Burkes and GE filed a joint motion requesting that the trial court make a finding that the agreement was reasonable under RCW 4.22.060(1). The motion explained that the proposed high-low agreement would "provide [GE] the ability to defend itself and its product at trial with the security of capping its potential risk and exposure, while providing [the Burkes] a certain minimal recovery to help offset their medical and other bills, expenses and damages, while preserving joint and several liability." CP at 3967. The motion also requested that the trial court issue an order in limine barring any references to the high-low agreement at trial. The Burkes and GE represented that the motion was unopposed.

At the reasonableness hearing on the high-low agreement, JHC stated that it did not oppose the motion, noting that the Supreme Court in *Barton*[2] had approved of such high-low agreements. JHC did not argue that the agreement violated public policy or otherwise was improper. The trial court found that there was no evidence of bad faith, collusion, or fraud and found that the high-low agreement was reasonable. The court also concluded that the settlement did not release GE from liability.

---

[2] *Barton v. Dep't of Transp.*, 178 Wn.2d 193, 207-08, 308 P.3d 597 (2013).

In addition, the court granted the motion in limine to exclude references to the high-low agreement. JHC did not object to this in limine order.

*Burkes' Motion to Exclude Expert Testimony*

The Burkes filed a motion for partial summary judgment to dismiss JHC's affirmative defenses of preexisting conditions and comparative fault. JHC withdrew the affirmative defenses, and the trial court dismissed them.

In the same motion, the Burkes moved to exclude JHC's proffered expert testimony referencing (1) Scott's congenital family history of mental disability or seizures and (2) Scott's marijuana use before or after LB's birth.

JHC had disclosed two expert witnesses, Dr. Thomas Wiswell and Dr. Paul Fisher, to provide expert testimony regarding the issue of causation and to rebut the opinions of the Burkes' experts. JHC opposed the motion, and submitted declarations from Dr. Wiswell. The parties also submitted excerpts from the depositions of the two experts.

Dr. Wiswell was board certified in pediatrics and perinatal-neonatal medicine. He stated an opinion on a more probable than not basis that LB's brain injuries were caused by fetal inflammatory response syndrome and that LB's organ damage occurred before Scott went into labor.

In his declaration, Dr. Wiswell stated that LB's injuries could have been caused by Scott's marijuana use during pregnancy, a family history of Scott's mother, Donna Scott,[3] having a seizure disorder, and a family history of multiple male family members having genetic abnormalities.

---

[3] We refer to Donna Scott by her first name to distinguish her from Scott. No disrespect is intended.

6

In his deposition, Dr. Wiswell stated that "it's a possibility" but not "more probably than not" that LB's deficits were related to Donna's seizure disorder, and that marijuana could have played a role in contributing to LB's injuries. CP at 3492. But Dr. Wiswell also stated that if Scott's family history of genetic abnormalities and seizure disorder and her prenatal marijuana use were not present or known, LB still would have sustained the same type of injuries because the "major source of her injury was from inflammation." CP at 3519. Dr. Wiswell admitted that he did not know the diagnosis or cause of Donna's seizure disorder or LB's uncles' genetic abnormalities.

Dr. Fisher was board certified in pediatrics and neurology with special qualifications in child neurology. He stated an opinion that LB's brain injury most likely was caused by an infectious or inflammatory process that affected both Scott and LB between one to seven days before the delivery.

In his declaration and deposition, Dr. Fisher stated that it was possible that Scott's prenatal marijuana use could have "been one of the many causes or contributing factors to [LB's] neurodevelopmental impairments." CP at 3563. But Dr. Fisher did not believe that marijuana could fully explain LB's condition.

In his deposition, Dr. Fisher stated that based on some photos he saw of LB, he believed that her facial features showed some mild dysmorphisms. But he stated that her facial features did not necessarily mean that she had some kind of genetic disorder, but rather that it triggered the need to do a genetic evaluation. He did not know the type of genetic disorders that the male members of LB's family had and had no way of linking LB's uncles' genetic disorders with LB.

The trial court granted the Burkes' motion to exclude all references to Scott's family genetic history and Scott's prenatal marijuana use as possible causes of injury. The court found

7

that any expert testimony regarding genetic history and marijuana use was speculative and irrelevant under ER 401, ER 402, ER 403, and ER 702.

*Jury Selection for First Trial*

The trial started in October 2018 in Jefferson County Superior Court. The court clerk summoned 80 potential jurors and only 60 potential jurors showed up for jury selection. After two days of voir dire, the trial court had dismissed 38 jurors for hardship or for cause. As a result, there were only 22 potential jurors left, which was an insufficient number to seat a jury if all parties exercised their peremptory challenges. The Burkes, GE, and JHC all agreed that the court should declare a mistrial.

*Motions in Limine*

In December, the trial court entered two orders on a number of the Burkes' and JHC's motions in limine. Relevant here, the court granted the Burkes' motion in limine to exclude undisclosed or improperly disclosed opinions and evidence. The court also granted JHC's motion in limine to exclude references to any medical article or textbook without laying adequate foundation and to preclude any articles or other learned treatises from going to the jury as exhibits. The court reserved ruling on JHC's motions in limine (1) regarding references to articles or medical literature that was not provided to counsel as a basis for expert opinions and (2) to exclude testimony not previously disclosed. JHC withdrew a motion in limine to prelude references to post-January 2014 medical literature to establish standard of care.

*Change in Venue*

In April 2019, the Burkes filed a motion for a bench trial or, in the alternative, for transfer of venue to King County in part on the grounds that an impartial jury could not be impaneled in Jefferson County. The motion highlighted that (1) Jefferson County's only superior court judge

had to recuse himself, which resulted in a visiting judge from Kitsap County to be assigned to the case; (2) there was only one courtroom in Jefferson County, which meant that a civil trial could be interrupted at any time by a criminal trial; (3) the earlier mistrial was a waste of expenses; and (3) travel to Port Townsend from other areas of the state and Seattle-Tacoma airport (for out-of-state witnesses) was limited, significantly increasing expenses and causing logistical difficulties.

JHC opposed the motion. In support of its opposition, JHC submitted a declaration from Wendy Steadman, the director of the Family Birth Center at JHC. She explained that the Family Birth Center had 17 registered nurses and that two nurses were assigned to each shift. If one nurse was unavailable, then a travel nurse could be used in his or her absence. Steadman stated that Scott's primary nurses in the case were highly experienced nurses and that it would pose as a significant hardship to the Family Birth Center if they were unavailable for a long trial in King County. She also stated that Dr. Bickling's absence would have an adverse impact on the Family Birth Center.

The trial court denied the Burkes' motion to have the venue transferred to King County and instead ruled that venue would be changed to Kitsap County. The court found that a transfer of venue was warranted pursuant to RCW 4.12.030(2) because an impartial jury could not be impaneled in Jefferson County and pursuant to RCW 4.12.030(3) because the ends of justice supported a change of venue to Kitsap County. JHC filed a motion for reconsideration, which the trial court denied.

Trial was scheduled in November 2019 in Kitsap County Superior Court.

*Jury Selection for Second Trial*

During jury selection for the second trial, the Burkes challenged at least two female prospective jurors for cause; did not object when JHC challenged a female prospective juror for

9

cause; and stipulated to removing other women from the jury. The Burkes also objected to JHC's for cause challenges to two male prospective jurors.

The Burkes had six peremptory challenges and JHC and GE each had three. All of the prospective jurors for which the Burkes and GE exercised their peremptory challenges were male. However, the Burkes used only four of their peremptory challenges and GE only used two of its peremptory challenges. JHC used its three peremptory challenges on women. There were five men on the final jury panel, including alternates, after the peremptory challenges were exercised.

JHC was concerned that the Burkes and GE were working together to remove male jurors from the panel and challenged the use of their peremptory challenges. The trial court treated JHC's objection as a *Batson* challenge and asked the Burkes and GE to provide gender-neutral reasons for their peremptory challenges. The Burkes and GE explained that they excluded jurors because they had a negative outlook on malpractice cases, had family members who were in the healthcare field, had political views that were concerning, or were unresponsive during the jury selection process. The court stated that the record did not support a *Batson* challenge and overruled JHC's objection.

*CR 21 Motion to Dismiss GE*

Eleven days after the start of trial, JHC filed a motion under CR 21 to dismiss GE as a defendant. JHC alleged that the Burkes' and GE's high-low agreement was a binding settlement agreement that released GE of all liability and that both the Burkes and GE had failed to produce any evidence at trial against each other. The Burkes and GE opposed JHC's motion on the grounds that a CR 21 motion was procedurally improper or untimely and that JHC had never withdrawn its affirmative defense of third-party fault. The trial court denied JHC's motion to

10

dismiss GE under CR 21 on the grounds that there were unresolved issues of liability with respect to GE.

JHC did not argue in its written motion or during argument on the motion that the high-low agreement violated public policy or otherwise was improper.

*JHC Motion for Mistrial*

Dr. Kathleen Lagana testified as the Burkes' nursing expert in the area of labor and delivery and fetal monitoring. She testified, among other things, about the nursing standard of care. During direct examination, the Burkes asked Dr. Lagana if she was familiar with the 2001, 2007, 2011, and 2019 editions of the textbook *Essentials of Fetal and Uterine Monitoring* by Michelle Murray. Dr. Lagana testified that she had reviewed those textbooks in her work as a fetal monitoring nurse educator and that they generally were considered to be an authoritative reference in the obstetrical community on the issue of fetal monitoring and maternal and fetal heart rate.

Dr. Lagana testified that the fetal heart strip in the 2019 textbook by Murray was a classic example of maternal and fetal heart rate confusion. The fetal heart strip in the 2019 textbook was accompanied with a text description that said, "Entire tracing is the MHR [maternal heart rate]. Note the Smart BP feature with a MHR of 153 bpm [beats per minute]. The MHR taken approximately 35 seconds prior to the contraction is evidence that the entire tracing was MHR and not the FHR [fetal heart rate]." CP at 1825. Over JHC's objections, the trial court allowed the Burkes to use the 2019 textbook excerpt for illustrative purposes.

Dr. Lagana testified that she extensively reviewed the fetal heart strip that was involved in LB's birth. She explained what each line on the strip corresponded to and how it related to the labor and delivery process, along with the standard of care for nurses as it related to analyzing

11

and documenting their findings regarding the fetal heart strip. Dr. Lagana testified that part of the standard of care for nurses included recognizing maternal and fetal heart rate confusion. Dr. Lagana stated that the standard of care with respect to being able to distinguish between the maternal heart rate and the fetal heart rate on the electronic fetal monitor had remained consistent over the last two decades.

JHC objected to the Burkes' use of the 2019 textbook as a violation of the Burkes' motion in limine regarding the use of subsequent publications post-2014, which the trial court overruled. The court determined that the motion in limine had been withdrawn and that regardless, the standard of care had not changed between 2014 and 2019.

During direct examination of nurse Crawford, the Burkes displayed the fetal heart strip in the 2019 textbook for the jury, which included the text description beneath the image stated above. The Burkes asked Crawford whether the fetal heart strip in the 2019 textbook was actually a tracing of a maternal heart rate and whether she recognized the tracing as Scott's during her labor and delivery. Crawford did recognize the tracing as Scott's. JHC objected to the use of the 2019 textbook excerpt, and the trial court overruled the objection.

JHC filed a motion for mistrial based on the Burkes' use of the 2019 textbook excerpt during trial. JHC argued that the 2019 textbook excerpt was never disclosed during discovery and that the use of the 2019 textbook excerpt violated several orders in limine. JHC also claimed that the Burkes could not establish the standard of care from 2014 with the 2019 textbook excerpt that was not applicable during Scott's labor and delivery. The Burkes opposed JHC's motion in part on the grounds that they properly disclosed the 2019 textbook before trial and that they provided a copy of the exhibit to JHC via an online folder.

The trial court denied JHC's motion for a mistrial and provided a curative instruction to the jury to disregard the text in the 2019 textbook that described the fetal heart strip.

*The Burkes' Economic Expert Testimony*

Dr. Frederick DeKay, a Ph.D. economist, testified as the Burkes' economic expert regarding the economic value of LB's life care plan and any related lost earnings. Dr. DeKay explained his methodology as to how he calculated the present net value of the costs detailed in the life care plan, how that would be projected in the future, how it would be reduced to present net value today, and how inflation and interest played a role in his calculations. For example, Dr. DeKay explained that he used 4.3 percent as the average wage inflation and that he reduced the future amounts he calculated by 0.9 percent to account for interest.

Dr. DeKay stated that an annuity was a financial instrument that involved paying an initial lump sum and would provide for future payments over a specified time period. He estimated that any annuity quotes for LB's life care plan would be similar to the dollar figures he calculated. Dr. DeKay testified that the adequacy of any annuity quote would depend on the issue of inflation and unanticipated inflation and provided examples of how those factors impact periodic payments.

*Periodic Payments*

During trial in the context of examination of LB's guardian Wolf, JHC stated its intention to invoke the periodic payment provisions of RCW 4.56.260 and to propose specific jury instructions regarding those provisions.

Following the close of evidence, the parties conferred with the trial court to discuss jury instructions and the special verdict form. There was no court reporter present during the discussion, but GE took notes at the conference to memorialize their discussion that day. The

notes showed that JHC intended to preserve its statutory right under RCW 4.56.260 to request periodic payments for future economic damages. As a result, JHC wanted the special verdict form to have separate lines for LB's future medical care, future services, future wage loss, and noneconomic damages. The court agreed with JHC's argument.

As part of the final jury instructions, instruction number 20 stated that "[a]ny award for future economic damages must be for the present cash value of those damages." CP at 2156. "Present cash value" was defined as "the sum of money needed now which, if invested at a reasonable rate of return, would equal the amount of loss at the time in the future when the expenses must be paid or the earnings would have been received." CP at 2156. Instruction number 20 further instructed the jury to apply the rate of interest as the "rate which in your judgment is reasonable under all the circumstances." CP at 2156.

The special verdict form instructed the jury to award damages to LB in two separate categories: future economic damages and non-economic damages. Future economic damages had three separate categories: (1) medical care, treatment, and services; (2) lost earnings and earnings capacity; and (3) necessary nonmedical expenses.

*CR 50 Dismissal of GE*

At the end of trial, GE proposed bringing a motion for judgment as a matter of law under CR 50 to dismiss GE as a party. The Burkes agreed that the trial court should dismiss GE. JHC did not object to dismissing GE under CR 50. The court granted GE's motion and dismissed GE from the case.

*Jury Verdict*

After six weeks of trial, the jury returned a verdict finding JHC negligent and finding that JHC's negligence proximately caused LB's damages and Scott's and Burke's damages. The jury

awarded LB $2 million in future medical care, treatment, and services; $1,050,000 for future lost earnings and earnings capacity; $10 million for future necessary nonmedical expenses; and $6,250,000 for non-economic damages. The jury awarded Scott and Burke $4.6 million in damages.

On the same day that the jury rendered its verdict, the trial court entered judgment on the jury verdict with no objection from JHC. The judgment did not include periodic payments for the future economic damages.

*Motion to Amend Judgment*

Six days after the trial court entered judgment on the jury's verdict, JHC filed a motion to amend the judgment to provide for periodic payments for future economic damages pursuant to RCW 4.56.260(1). The Burkes opposed JHC's motion, arguing that JHC failed to object at entry of judgment and that JHC should have raised the RCW 4.56.260 issue before trial and before examination of the Burkes' expert economist. In reply, JHC referenced three different occasions when it invoked its intent to seek periodic payments: in its answer to the Burkes' complaint, during discovery, and during cross-examination of LB's guardian at trial.

After oral argument, the trial court granted JHC's motion to amend the judgment in part, but reserved its decision on how the periodic payments should be structured and did not request any proposals for periodic payments until the conclusion of this appeal.

JHC appeals the trial court's judgment on the jury verdict. The Burkes cross-appeal the trial court's order granting JHC's motion to amend the judgment to include periodic payments for future economic damages.

ANALYSIS

A.    CHANGE IN VENUE

JHC argues that the trial court erred in transferring venue to Kitsap County because RCW 70.44.060(8) mandates that the venue of this case must be in Jefferson County and RCW 4.12.030 did not support a change in venue.  This argument is incorrect.

    1.    Legal Principles

The trial court may change the place of trial when "there is reason to believe that an impartial trial cannot be had therein," RCW 4.12.030(2), or when "the convenience of witnesses or the ends of justice would be forwarded by the change," RCW 4.12.030(3).  We review an order to change venue for an abuse of discretion.  *Hatley v. Saberhagen Holdings, Inc.*, 118 Wn. App. 485, 488, 76 P.3d 255 (2003).  A trial court abuses its discretion when its decision is based on untenable grounds or is made for untenable reasons.  *Id.*

    2.    Effect of RCW 70.44.060(8)

JHC argues that RCW 70.44.060(8) requires that a lawsuit against a public hospital district be tried in the county where the public hospital district is located.  RCW 70.44.060(8) provides that public hospital districts have the power "[t]o sue and be sued in any court of competent jurisdiction: PROVIDED, [t]hat all suits against the public hospital district *shall be brought* in the county in which the public hospital district is located."  (Emphasis added.)

RCW 70.44.060(8) does not state that all lawsuits against a public hospital district must be *tried* in the county where the hospital district is located.  The statute states that a lawsuit must be "*brought*" in the county where the hospital district is located.  RCW 70.44.060(8) (emphasis added).  The term "brought" plainly refers to the filing of the lawsuit.  Nothing in RCW 70.44.060(8) suggests that the venue cannot be changed after the lawsuit has been filed.  And to

16

strictly interpret the statute as JHC proposes would restrict a trial court's ability to exercise discretion to change venue when necessary to further the ends of justice and ensure a fair and impartial trial.

JHC also relies on RCW 70.44.900, which provides that when a provision of chapter 70.44 RCW "comes in conflict with any provisions, limitation or restriction in any other law, this act [1945 c 264] shall govern and control." But as stated above, RCW 70.44.060(8) only requires that a lawsuit against a public hospital district be filed in the county where the hospital district is located. Therefore, a subsequent change of venue under RCW 4.12.030 does not conflict with RCW 70.44.060(8).

Accordingly, we conclude that RCW 70.44.060(8) does not preclude a trial court from changing venue under RCW 4.12.030.

3. Application of RCW 4.12.030

a. RCW 4.12.030(2)

The trial court found that a transfer of venue was warranted pursuant to RCW 4.12.030(2) because an impartial jury could not be impaneled in Jefferson County.

Out of the 60 potential jurors who appeared for jury duty in the first trial, 38 jurors were dismissed for hardship or for cause. A number of potential jurors had personal relationships with the parties or witnesses and that they stated that those relationships would impact their ability to remain fair and impartial. For example, some jurors stated that they were family friends with the Burkes or that they grew up with Scott. Other potential jurors stated that they were former or current patients of JHC or Dr. Bickling, and Dr. Bickling had delivered the babies of some of the jurors. And both the Burkes and JHC agreed that no current employees of JHC could be on the jury.

17

JHC argues that an impartial jury could have been created if the jury pool had been enlarged. But JHC fails to cite to any legal authority that requires the trial court to exhaust all possibilities of creating an impartial jury before exercising its discretion to change venue. In addition, the court noted that there was a large percentage of the potential jurors who had a connection with a party involved and that it would be difficult to continue bringing in additional potential jurors to empanel an impartial jury.

JHC also argues that prospective jurors would not need to be excused simply because they were acquainted with the parties or they had been treated at JHC. However, JHC does not argue that certain prospective jurors should not have been excused at the first trial. In fact, after two days of jury selection JHC agreed with the trial court that there were an insufficient number of potential jurors left after excusing the other potential jurors for cause or hardship.

We conclude that the trial court did not err when it determined that a change in venue was justified under RCW 4.12.030(2).

b.   RCW 4.12.030(3)

The trial court also stated that the length of the trial and the logistics of the single courtroom in Jefferson County supported a change of venue in the interest of justice under RCW 4.12.030(3). The court explained that there was a "risk or potential of being bumped by a criminal case" and "Jefferson County [had] one courtroom, and the potential for a criminal case that could take a week, two weeks, three days, one day . . . is a real and apparent risk." CP at 2467. In addition, the court noted that it would be difficult to bring in more jurors given the size or layout of the courtroom.

JHC asserts that in deciding whether to change venue under RCW 4.12.030(3), the court must consider whether the change would cause undue hardship. JHC claims that changing venue

to Kitsap County was an undue hardship because Dr. Bickling and the two nurse witnesses would be forced to commute at least an hour away from the hospital to attend trial. As a result, they would have to take more time off from work and would be unavailable to their patients.

However, the declaration on which JHC relies merely stated without support that it could have been an undue hardship on the hospital to have the witnesses unavailable at some point during the trial because of the potential for increased patient populations or unforeseen emergencies. Nor did the witnesses need to be present every day during the length of the trial.[4]

We conclude that the trial court did not err when it determined that a change in venue was justified under RCW 4.12.030(3).

B.     *BATSON* CHALLENGE

JHC argues that the Burkes' use of peremptory challenges to excuse male prospective jurors constituted a *Batson* violation and violated its constitutional right to a fair trial and the excluded jurors' right to equal protection. This argument is incorrect.

1.     Legal Principles

During the jury selection process, each party may exercise peremptory challenges to remove prospective jurors without cause. *See Portch v. Sommerville*, 113 Wn. App. 807, 810, 55 P.3d 661 (2002). RCW 4.44.130 states that each party is allowed to make three peremptory challenges. Courts have recognized that peremptory challenges are integral to "assuring the selection of a qualified and unbiased jury." *Batson*, 476 U.S. at 91.

However, the United States Supreme Court held in *Batson* that peremptory challenges may not be exercised on the basis of a prospective juror's race. *Id.* at 89. To do so would

---

[4] JHC lists a number of factors that it claims the trial court must consider, but those factors are from cases addressing forum non conveniens, not venue. *See Myers v. Boeing Co.*, 115 Wn.2d 123, 128, 794 P.2d 1272 (1990).

constitute a violation of the equal protection clause under the United States Constitution because a defendant has a constitutional "right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id.* at 85-86. Although *Batson* challenges typically are raised in criminal cases, the same principles apply to civil cases as well. *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 631, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

As noted above, *Batson* addressed alleged racial discrimination. 476 U.S. at 93-94. Most Washington cases applying *Batson* also have involved claims of racially motivated juror challenges. *E.g.*, *State v. Jefferson*, 192 Wn.2d 225, 232, 429 P.3d 467 (2018). However, in *State v. Burch*, the court held that the traditional *Batson* analysis also applies to gender-based discrimination. 65 Wn. App. 828, 836, 830 P.2d 357 (1992); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). The Burkes do not argue that *Batson* does not apply here. We assume that *Batson* applies to claims of gender-based juror challenges.

Washington has adopted the *Batson* three-step analysis when the use of a peremptory challenge was based on a juror's race. *Jefferson*, 192 Wn.2d at 231. First, the party raising the *Batson* challenge bears the burden of establishing "a prima facie case that 'gives rise to an inference of discriminatory purpose.' " *Id.* at 231-32 (quoting *Batson*, 476 U.S. at 94). This requires establishing that (1) the peremptory challenge was exercised against a constitutionally protected group, and (2) that fact and additional relevant circumstances raise an inference that the peremptory challenge was based on that prospective juror's membership in that protected group. *State v. Evans*, 100 Wn. App. 757, 763-64, 998 P.2d 373 (2000). " 'Relevant circumstances' may include a pattern of strikes against members of the group or the particular

20

questions asked during voir dire." *Id.* at 764 (quoting *State v. Rhodes*, 82 Wn. App. 192, 196, 917 P.2d 149 (1996)).

Second, the burden then shifts to the party exercising the peremptory challenge to provide a neutral explanation for the challenge. *Jefferson*, 192 Wn.2d at 232. The party must offer more than a general denial of discriminatory intent. *Evans*, 100 Wn. App. at 764.

The traditional third step is if a neutral explanation is provided, the trial court must determine if the challenging party has established purposeful discrimination. *Jefferson*, 192 Wn.2d at 232. However, the Supreme Court in *Jefferson* modified the third step of a *Batson* analysis because the court concluded that the traditional inquiry of whether the challenging party has established purposeful discrimination did not adequately address pervasive racial discrimination during jury selection. *Id.* at 24243, 252. The court stated:

> [W]e hold that the question at the third step of the *Batson* framework is *not* whether the proponent of the peremptory strike is acting out of purposeful discrimination. Instead, the relevant question is whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." If so, then the peremptory strike shall be denied.

*Id.* at 249.

Under the traditional analysis, we review the trial court's *Batson* determination "for clear error and defer to the trial court to the extent that its rulings are factual." *Id.* at 232. But because the modified third step involves an objective standard, we review de novo the record and the trial court's conclusions regarding that modified step. *Id.* at 249-50.

2.   Analysis

After the Burkes and GE identified their peremptory challenges, JHC objected to the use of those challenges to strike only male prospective jurors. The trial court acknowledged that this objection triggered a *Batson* analysis.

### a. First Step

The trial court did not expressly find that JHC had established a prima facie case of purposeful gender discrimination. Instead, the court went straight to the second step, asking the Burkes and GE to provide gender-neutral reasons for their challenges. Therefore, the court made an implied finding that JHC had satisfied the first step of the *Batson* analysis.

The Burkes argue that JHC failed to establish a prima facie case giving rise to an inference of discriminatory purpose. However, all of the peremptory challenges the Burkes and GE used were on men. Under an abuse of discretion standard, we conclude that this fact supports the trial court's implied finding that JHC had established a prima facie case.

### b. Second Step

Regarding the second step of *Batson*, the Burkes and GE both provided gender-neutral explanations for the peremptory challenges used against male prospective jurors. The Burkes excluded juror 41 because he had negative thoughts on malpractice cases and because his wife who was a nurse. The Burkes excluded juror 21 because he provided "no response to any questions" and "seemed uninvolved in the process," which therefore meant that "he would not be an involved juror in responding to questions." 5 Report of Proceedings (RP) at 1059. He also was unmarried and had no children, which the Burkes stated could lead to an inability to relate to their experience. The Burkes excluded juror 27 because he believed that "the number of lawsuits have increased the cost of healthcare" and that his political views were concerning based on the type of news outlets that he followed. 5 RP at 1060. Finally, the Burkes excluded juror 2 because he believed that "medical negligence suits drive up the costs of health insurance and malpractice concerns" and his wife and daughter were healthcare providers. 5 RP at 1060.

22

GE explained that it excluded juror 37 because he "barely participated in the [jury selection] process" and was working in a quasi-law enforcement capacity as a security guard. 5 RP at 1061. GE excluded juror 4 because he had done some consulting work for law firms and potentially could persuade other jurors to follow his opinions, he had a nurse in his family, and he had a family member who suffered a negative medical outcome.

There is no question that both the Burkes and GE provided gender-neutral justifications for their six peremptory challenges. JHC does not argue otherwise.

c. Third Step

The court in *Jefferson* modified the third step of the *Batson* analysis to address pervasive *racial* discrimination during jury selection. 192 Wn.2d at 242-43, 252. Therefore, it is unclear whether the modification (and de novo review) would apply to *Batson* challenges unrelated to racial discrimination as in this case, or whether the traditional third step (and abuse of discretion review) applies here.

Regardless of the standard of review, the record shows that JHC did not establish purposeful discrimination (traditional third step) and an objective observer would not view gender as a factor in the Burkes' and GE's peremptory challenges (modified third step).

First, the Burkes' and GE's explanations for their peremptory challenges seem legitimate rather than pretextual. For example, a medical negligence plaintiff certainly would be concerned about jurors who have negative views about malpractice cases or think lawsuits are increasing health costs. And while striking jurors because they were not engaged in the jury selection process could reflect bias, that fact was significant for a complex, six-week trial.

Second, the Burkes' behavior regarding for cause challenges did not reflect a bias against males or in favor of females. They challenged two female jurors for cause, did not object when

23

JHC challenged a female for cause, and stipulated to removing other females from the jury. And the Burkes resisted JHC's attempt to remove two male jurors for cause.

Third, the Burkes used only four of their six peremptory challenges and GE used only two of their three challenges even though that meant that several men remained on the jury. Arguably, if the Burkes and GE were attempting to systematically remove men from the jury, they would have used their remaining peremptory challenges on men.

Finally, out of the final jurors and alternates, five jurors were male. Therefore, the jury remained gender diverse despite the Burkes' and GE's exercise of peremptory challenges.

We conclude that the record does not support a finding of purposeful discrimination or a finding that an objective observer could view gender as a factor in the Burkes' and GE's peremptory challenges. Accordingly, we hold that the trial court did not err in denying JHC's *Batson* challenge regarding the exclusion of male prospective jurors.[5]

## C.      CR 21 MOTION TO DISMISS GE

JHC assigns error to the trial court's denial of its midtrial motion to dismiss GE under CR 21. However, in its brief JHC raises a number of additional arguments regarding the high-low agreement between the Burkes and GE. JHC argues that (1) the high-low agreement between the Burkes and GE was a "Mary Carter" agreement that was void as against public policy, (2) the trial court erred in ruling that the high-low agreement would not be disclosed to the jury, (3) the trial court should have dismissed GE as a party under RCW 4.22.060 at the reasonableness

---

[5] JHC claims that the trial court should have held an evidentiary hearing to assess its *Batson* challenge, relying on *State v. Berhe*, 193 Wn.2d 647, 444 P.3d 1172 (2019). But the Supreme Court in *Berhe* discussed an evidentiary hearing to address explicit and implicit racial bias as a factor *during jury deliberations*, not during the jury selection process. 193 Wn.2d at 657, 661-62. No Washington case has suggested that a trial court must hold an evidentiary hearing as part of a *Batson* analysis.

hearing, and (4) the trial court should have given JHC an offset equivalent to the reasonable value of the high-low agreement at the reasonableness hearing.

We reject JHC's CR 21 argument. And because JHC only assigned error to the trial court's denial of JHC's CR 21 motion to dismiss GE and JHC did not raise the additional issues at trial, we decline to address those issues.

### 1.    Failure to Preserve Arguments

Although JHC raises a number of additional arguments regarding the high-low agreement, JHC assigned error only to the trial court's denial of its motion to dismiss GE under CR 21. JHC did not assign error to any of the additional arguments. We generally do not address issues not included in the assignments of error. RAP 10.3(g); *Phillips v. Greco*, 7 Wn. App. 2d 1, 9, 433 P.3d 509 (2018).

More significantly, JHC did not raise these additional arguments in the trial court. We generally do not consider arguments raised for the first time on appeal. RAP 2.5(a); *Samra v. Singh*, 15 Wn. App. 2d 823, 838, 479 P.3d 713 (2020).

Regarding JHC's claim that the high-low agreement was void as against public policy, the record shows that JHC had ample opportunity to oppose the high-low agreement and failed to do so. When the Burkes and GE moved for approval of the agreement, JHC did not argue that the agreement was improper or void. Instead, JHC stated that it did not file an opposition, did not oppose the motion, and noted that the Supreme Court in *Barton* had approved of such high-low agreements. At the beginning of the second trial, JHC stated that it was "not suggesting [the high-low agreement] rises to the level of a Mary Carter agreement." 3 RP at 507.

Regarding JHC's claim that the high-low agreement should have been disclosed to the jury, the record shows that JHC did not state any opposition to the Burkes' and GE's motion in

25

limine to preclude references to the high-low agreement and did not object when the trial court ordered that there would be no reference to the agreement at trial. And JHC never attempted to revisit this order during trial.

Regarding JHC's claim that the trial court should have dismissed GE under RCW 4.22.060 after the reasonableness hearing on the high-low agreement, JHC never argued that the court should have dismissed GE at that time. And JHC did not object to the court's finding that the high-low agreement was not a release under RCW 4.22.070 because it did not fully and finally resolve the claims between the Burkes and GE. Finally, JHC did not argue pursuant to its CR 21 motion that GE should have been dismissed after the reasonableness hearing.

Regarding JHC's claim that the trial court should have given it an offset for the value of the high-low agreement at the reasonableness hearing, the record shows that JHC did not ask the court at the reasonableness hearing to establish the amount of an offset to JHC. JHC also did not request an offset when the Burkes and GE moved to dismiss GE under CR 50 at the end of trial, when the court entered judgment on the jury's verdict, and when it moved to amend the judgment to address periodic payments.

JHC never argued that (1) the high-low agreement violated public policy or otherwise was improper, (2) the jury should be informed of the high-low agreement, (3) the trial court should have dismissed GE under RCW 4.22.060 after the reasonableness hearing, or (4) it was entitled to an offset based on the high-low agreement. Therefore, we decline to address JHC's arguments raised for the first time on appeal.

2. CR 21 Motion to Dismiss GE

JHC argues that the trial court erred by denying its midtrial motion to dismiss GE as a party under CR 21. This argument is incorrect.

a. Legal Principles

CR 21 provides in part: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately." We review a trial court's decision to grant or deny a motion to drop a party from a case under CR 21 for abuse of discretion. *Shelby v. Keck*, 85 Wn.2d 911, 918, 541 P.2d 365 (1975).

In *Shelby*, Keck accidentally shot and killed the plaintiff's husband after consuming alcohol at a bar. 85 Wn.2d at 912. The plaintiff sued both Keck and the bar, but then entered into a settlement in which Keck's insurer agreed to pay $25,000 and the plaintiff agreed not to seek any recovery from Keck above that amount. *Id.* The trial court granted the bar's motion to dismiss Keck under CR 21. *Id.* at 913. The Supreme Court affirmed, concluding that the agreement was a binding settlement that left no justiciable dispute between the parties. *Id.* at 918.

In *Barton*, the plaintiff was injured in an accident and sued the driver who crashed into him, her parents under the family car doctrine, and the State for negligent highway design and maintenance. 178 Wn.2d at 197-98. The parents entered into a stipulation with the plaintiff to provide advance payment in the amount of $20,000. *Id.* at 198. The stipulation provided that any future settlement or verdict against the parents would be reduced by $20,000 and that the plaintiff would not execute on any judgment against the parents in excess of their liability insurance. *Id.* The stipulation expressly stated that the advance payment was not a settlement of any claims brought against the parents. *Id.*

The court concluded that the stipulation did not release the parents from all liability because (1) the motorcyclist and the parents did not intend to settle all claims between the parties

through the stipulation, (2) the State still had the right to seek contribution from the parents, and (3) the parents remained potentially liable to the motorcyclist in the amount of $20,000 to $100,000, the maximum allowable under their liability insurance. *Id.* at 212-13.

  b.  Analysis

JHC relies on *Shelby* to argue that the high-low agreement was a binding settlement agreement that left no justiciable issues to be resolved. But in *Shelby*, the settling defendant already paid the plaintiff the maximum amount of damages that could have been asserted against him pursuant to the settlement agreement. 85 Wn.2d at 912. Here, GE remained potentially liable to the Burkes for an amount between $1 million and $5 million. And the record shows that at the time of the settlement, GE was prepared to fully defend itself at trial to minimize its liability and the amount in damages owed to the Burkes. The high-low agreement here is more similar to the stipulation in *Barton*, which the court concluded did not release the defendant from liability. 178 Wn.2d at 213.

JHC also ignores the Supreme Court's suggestion in *Barton* that the issue of whether a settlement releases a party of liability depends on the intent of the parties. *Id.* at 209. Here, the record supports the inference that the Burkes and GE did not intend for the high-low agreement to release GE.

Finally, in *Shelby* the other defendant filed the CR 21 motion before trial started. 85 Wn.2d at 912. Here, JHC did not file its motion until the middle of the trial. That fact may have affected the trial court's exercise of its discretion.

The standard of review for CR 21 motions is abuse of discretion. *Shelby*, 85 Wn.2d at 918. We hold that the trial court did not abuse its discretion when it denied JHC's mid-trial motion to dismiss GE as a party under CR 21.

28

D. ORDER IN LIMINE TO EXCLUDE OTHER CAUSATION THEORIES

JHC argues that the trial court erred when it granted the Burkes' motion in limine to exclude other causation theories, specifically JHC's expert testimony from Dr. Wiswell and Dr. Fisher regarding Scott's family genetic history and seizure disorder and her prenatal marijuana use. This argument is incorrect.

1. Legal Principles

We review a trial court's decision to grant a motion in limine for an abuse of discretion. *Gunn v. Riely*, 185 Wn. App. 517, 531, 344 P.3d 1225 (2015). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Terrell v. Hamilton*, 190 Wn. App. 489, 499, 358 P.3d 453 (2015).

a. ER 702

ER 702 provides that a court may permit a witness qualified as an expert to provide an opinion regarding scientific or specialized knowledge if such testimony may assist the trier of fact. "Admission is proper provided the expert is qualified and his or her testimony is helpful." *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016). The expert's opinion must be grounded on facts and cannot be conclusory or based on an assumption. *Id.*

An expert opinion that lacks adequate foundation must be excluded. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 357, 333 P.3d 388 (2014). Similarly, expert testimony is inadmissible when it is speculative and not helpful to the trier of fact. *Volk*, 187 Wn.2d at 277.

"[T]rial courts are afforded wide discretion and trial court expert opinion decisions will not be disturbed on appeal absent an abuse of such discretion." *Johnston-Forbes*, 181 Wn.2d at 352. An abuse of discretion occurs when the trial court's ruling is "unsupported by the record or

result[s] from applying the wrong legal standard." *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018).

    b.    ER 401, 402, and 403

Only relevant evidence is admissible. ER 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The threshold to admit relevant evidence is low and even minimally relevant evidence is admissible. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 729, 315 P.3d 1143 (2013).

However, even relevant evidence may be excluded under ER 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or mislead[s] the jury." Trial courts have broad discretion in weighing the probative value of evidence against its prejudicial impact. *Needham v. Dreyer*, 11 Wn. App. 2d 479, 493, 454 P.3d 136 (2019), *review denied,* 195 Wn.2d 1017 (2020).

    c.    Case Law

In *Colley v. Peacehealth*, the court held that the trial court did not err when it allowed three defense experts to testify that a plaintiff's memory loss after his hospital visit was caused either by his documented history of several preexisting conditions, his history of heavy alcohol drinking, or his prior traumatic brain injury. 177 Wn. App. 717, 728-31, 312 P.3d 989 (2013). The experts provided alternative theories of causation to explain the plaintiff's memory loss after his hospital visit based on undisputed and admissible evidence, including the plaintiff's preexisting conditions, such as obstructive sleep apnea, and CT scans of his brain before and after the respiratory event at the hospital. *Id.* at 728-30.

In *Needham*, the court held that the trial court erred when it relied on *Colley* to admit expert testimony that was irrelevant and highly prejudicial on the issue of causation. 11 Wn. App. 2d at 493. In that case, the plaintiff had been found unconscious in a winter cabin a few days after a doctor's appointment regarding his breathing and gastrointestinal issues. *Id.* at 481. The plaintiff's legs were amputated due to frostbite. *Id.* He sued his primary care physician and hospital, alleging medical negligence. *Id.* at 481-82. The trial court allowed the hospital's two experts to testify that the plaintiff's use of alcohol on the day of the incident could have caused his collapse. *Id.* at 486.

The court determined that *Colley* was distinguishable because the experts there relied on admissible evidence of a detailed medical history and a documented history of alcoholism. *Id.* at 495. In comparison, the experts in *Needham* relied on the plaintiff's statement that he took three shots of alcohol on the day of the incident and merely speculated that it was *possible* that alcohol caused the collapse despite the fact that there was no alcohol found in his system when he was admitted into the hospital. *Id.* at 496. The court concluded that the expert testimony was both speculative and highly prejudicial with little probative value. *Id.* at 496-97.

2. Analysis

The trial court distinguished *Colley* from this case and determined that Dr. Wiswell's and Dr. Fisher's alternative theories of causation regarding Scott's family genetic history and her prenatal marijuana and tobacco use were irrelevant, unduly speculative, lacked foundation, highly prejudicial, and not helpful to the trier of fact. The record supports the trial court's determination that Dr. Wiswell's and Dr. Fisher's testimonies did not meet the evidentiary foundational requirements of ER 401-03 and ER 702.

Both Dr. Wiswell and Dr. Fisher speculated that genetics was a *possible* cause of LB's health issues. They admitted that there was no way to show how Scott's family history of genetic abnormalities in male family members could be related to LB's health conditions, which warranted exclusion under ER 702. Dr. Fisher noted that genetic disorders in Scott's family had been restricted to males and that he had no knowledge about what type of genetic disorders the male family members had beyond "some element of either some cognitive or delay process." CP at 3484. Although Dr. Fisher believed that photos of LB showed some dysmorphic features, he also admitted that it did not necessarily mean she had some kind of genetic disorder and that there was nothing in her medical records that identified dysmorphia. Dr. Wiswell testified that there was no specific diagnosis for the cause of the genetic abnormalities in the male family members and that he did not know what LB's genetic cause might be.

Dr. Wiswell also alleged that LB's seizure disorder *possibly* was connected through Donna, who had a seizure disorder. But Donna was diagnosed with adolescent epilepsy, which presented differently from the type of seizures that LB experienced. And Dr. Wiswell admitted that he had no knowledge as to what type of seizures that Donna had or whether it was hereditary.

In short, the record shows that neither expert could draw the connection between Scott's family history of genetic abnormality that affected male family members and Donna's seizure disorder with LB's brain injury, neurological functioning, or seizure disorder that developed shortly after her birth.

In addition, neither expert provided any testimony that explained how Scott's prenatal marijuana use could have caused the type of injuries that LB sustained. Both Dr. Wiswell and Dr. Fisher stated that Scott's prenatal marijuana use *may* have contributed to LB's conditions.

Dr. Fisher also stated that there was no medical literature that showed a correlation between the prenatal marijuana use with the type of brain injury that LB sustained and that marijuana could not fully explain LB's condition. And the articles that Dr. Wiswell relied on likewise acknowledged that the research was developing on how marijuana may change the brain or to what extent marijuana use may affect pregnancy.

Finally, in *Colley* the court allowed defense experts to testify about possible causes of a plaintiff's injuries even though they could not state opinions regarding causation on a more probable than not basis. 177 Wn. App. at 728-32. But Dr. Wiswell and Dr. Fisher *did* state opinions regarding causation on a more probable than not basis – they opined that LB's injuries were caused by inflammatory or infectious processes. *Colley* is distinguishable on that basis.

Even if Dr. Wiswell's and Dr. Fisher's testimonies were minimally relevant, exclusion still was reasonable under ER 403. JHC failed to establish that the proffered expert testimony had any probative value because both experts admitted that there was no indication in LB's medical records that genetics may have caused or even contributed to her health issues or that prenatal marijuana use could result in the type of injuries that LB sustained. Dr. Wiswell also testified that a family history of genetic abnormalities and seizures and prenatal marijuana use were "factors that could have influenced [LB's condition] in a minor way" and that "[i]f none of these factors were present or known in this case," LB's condition still would remain the same. CP at 3519.

Accordingly, we hold that the trial court did not err when it granted the Burkes' motion in limine to exclude all testimony on Scott's family history of genetic abnormalities and seizure disorders and Scott's prenatal marijuana use.

E.      MOTION FOR MISTRIAL

JHC argues that the trial court erred in denying its motion for a mistrial on the grounds that the Burkes committed a number of discovery and in limine order violations when they relied on an excerpt from a 2019 textbook to establish the 2014 standard of conduct at trial. This argument is incorrect.

1.    Legal Principles

Under CR 59(a)(2), a court may vacate a verdict and grant a new trial if the prevailing party's misconduct materially affects the substantial rights of the aggrieved party. *Spencer v. Badgley Mullins Turner, PLLC*, 6 Wn. App. 2d 762, 790, 432 P.3d 821 (2018). "A party seeking a new trial based on counsel's conduct must establish that (1) the conduct was misconduct, (2) the misconduct was prejudicial, (3) the misconduct was objected to at trial, and (4) the misconduct was not cured by the trial court's instructions." *Id.*

We review a trial court's decision to deny a motion for a new trial pursuant to CR 59(a)(2) for abuse of discretion. *Id.* When reviewing a trial court's decision, we consider whether the aggrieved party was so prejudiced by the prevailing party's misconduct that he or she was deprived of a fair trial. *Id.* "The trial court is in the best position 'to most effectively determine if counsel's misconduct prejudiced a party's right to a fair trial.'" *Id.* (quoting *Miller v. Kenny*, 180 Wn. App. 772, 815, 325 P.3d 278 (2014)).

2.    Discovery Violations

JHC argues that the Burkes committed several discovery violations when they failed to disclose that (1) they were in communication with the authors of a 2019 textbook regarding the use of LB's fetal heart strip as an example of maternal heart rate confusion and (2) they intended

to use the 2019 textbook excerpt to establish the standard of care in 2014. This argument is incorrect.

JHC fails to explain which specific discovery rules that it believes the Burkes violated. And according to the Burkes' attorney's declaration, the 2019 textbook was listed as trial exhibit 60 in their amended trial witness and exhibit list and was provided to JHC through an online folder. In addition, the 2019 textbook was offered as a type of "learned treatise" that was used for impeachment and illustrative purposes, not as a form of expert opinion. Kitsap County Local Rules 16(b)(1)(B) and (C) do not require parties to exchange exhibits that are used only for impeachment or illustrative purposes.

Here, the 2019 textbook excerpt containing the fetal heart strip was used for impeachment and illustrative purposes during trial, such as asking Dr. Lagana whether she believed that the excerpt in the 2019 textbook was an example of how the fetal heart rate can be confused with the maternal heart rate, and asking Crawford if she believed that Scott's fetal heart strip was identical to another example of maternal heart rate during contractions. Accordingly, the Burkes were not required to disclose the 2019 textbook excerpt in discovery, but apparently did so anyway.

3.    In Limine Order Violations

JHC argues that the Burkes' use of the 2019 textbook excerpt violated four specific in limine orders, primarily on the grounds that the Burkes used the 2019 textbook excerpt to establish the 2014 standard of care rather than for illustrative purposes. JHC also claims that these violations were unduly prejudicial because it allowed the Burkes to prevail on its medical negligence claim by holding Crawford to a new 2019 standard of care. These arguments are incorrect.

JHC's allegations are premised in part on the theory that the 2019 textbook excerpt was actually admitted as an expert opinion to establish standard of care. But the 2019 textbook was offered as a learned treatise that was admissible under ER 803(a)(18) for illustrative purposes.

Even if the Burkes' use of the 2019 textbook excerpt did violate in limine orders by referencing a 2019 standard of care, Dr. Lagana testified that the standard of care with respect to the ability to distinguish the maternal heart rate from the fetal heart rate had not changed between 2001 and 2019. Further, there were several experts who reviewed the actual fetal heart strip during Scott's labor and explained how there was a breach of standard of conduct while monitoring the fetal heart rate. As a result, any misconduct was not prejudicial.

The trial court also provided a curative instruction to the jury to disregard the text in the 2019 textbook that described the fetal heart strip example. Therefore, any violation that may have occurred did not rise to the level of prejudice that requires a grant of new trial.

JHC argues that it was denied the opportunity to cross-examine the authors of the 2019 textbook. But JHC cites to no authority that has treated authors of a learned treatise as expert testimony. And as stated above, the 2019 textbook excerpt was used purely for illustrative purposes. JHC also had the opportunity to probe on cross-examination the validity and weight that should be afforded to the 2019 textbook excerpt. Accordingly, we reject this argument.

We hold that the trial court did not err in denying JHC's motion for a mistrial based on the Burkes' use of the 2019 textbook excerpt.

F.   FAILURE TO RECUSE

JHC argues that the trial judge erred when she failed to reveal her potential bias regarding the alleged fact that she had a special needs child and subsequently failed to recuse herself given the appearance of bias. We decline to address this argument.

JHC alleges that the trial judge stated during a side bar conference that she had a special needs child in her family. JHC argues that the judge should have notified the parties of this fact and ultimately should have recused herself. However, the record cites that JHC provides do not support its allegation that the trial judge revealed that she had a special needs child in her family. And nothing else in the record supports the allegation.

The party presenting an issue for review bears the burden to provide an adequate record to support his or her argument on appeal. *Fahndrich v. Williams*, 147 Wn. App. 302, 307, 194 P.3d 1005 (2008); *see also* RAP 9.2(b). JHC has not provided any record that supports its argument that the trial judge acted inappropriately with regard to recusal.

Further, JHC did not object or raise any concern when the trial judge allegedly stated that she had a special needs child in her family. JHC responds that it was precluded from taking any action in the trial court because the trial court did not reveal her potential conflict during trial except for a passing reference. But nothing in the record shows that JHC asked the court to explain the statement or request more information. And JHC never filed a recusal motion or motion for mistrial based on this information. We generally do not consider issues raised for the first time on appeal. *Samra*, 15 Wn. App. 2d at 838.

Accordingly, we decline to consider JHC's recusal argument.

G.    AMENDING JUDGMENT TO PROVIDE FOR PERIODIC PAYMENTS UNDER RCW 4.56.260

The Burkes argue on cross-appeal that the trial court erred in granting JHC's request for periodic payments of future economic damages because JHC waived any right to seek periodic payments by (1) not providing sufficient notice that it planned to invoke RCW 4.56.260, (2) not proposing a periodic payment plan as required by RCW 4.56.260(2), and (3) not objecting to

entry of judgment on the jury's verdict that did not contain a periodic payment provision. This argument is incorrect.

1.    Legal Principles

RCW 4.56.260(1) provides,

> In an action based on fault seeking damages for personal injury or property damage in which a verdict or award for future economic damages of at least one hundred thousand dollars is made, the court or arbitrator shall, at the request of a party, enter a judgment which provides for the periodic payment in whole or in part of the future economic damages. With respect to the judgment, the court or arbitrator shall make a specific finding as to the dollar amount of periodic payments intended to compensate the judgment creditor for the future economic damages.

RCW 4.56.260(2) states that (1) "[p]rior to entry of judgment, the court shall request each party to submit a proposal for periodic payment of future economic damages to compensate the claimant"; and (2) "the court shall select the proposal, with any changes the court deems proper, which in the discretion of the court and the interests of justice best provides for the future needs of the claimant and enter judgment accordingly."

The Burkes' arguments involve the interpretation and application of RCW 4.56.260. Statutory interpretation is an issue of law that we review de novo. *TST, LLC v. Manufactured Housing Dispute Resolution Program of Office of Attorney General*, 17 Wn. App. 2d 662, 668, 485 P.3d 977 (2021). The primary goal of interpretation is to discern and give effect to the legislature's intent. *Id.* We look to the plain language of the statute, the context of the statute in which the provision is found, and related statutes. *Id.* "We give effect to all the language in the statute and do not render any portion meaningless or superfluous." *Id.*

The Burkes challenge the trial court's grant of JHC's motion to amend the judgment. Under CR 59(h), a trial court may alter or amend a judgment if a motion is brought within 10 days after its entry. CR 59(a) states nine grounds that support a new trial or reconsideration. But

there are no required grounds for altering or amending a judgment under CR 59(h).  CR 59(h) can be used to request that the trial court amend the judgment to reflect a party's legal argument regarding the terms of the judgment.  *See Coulter v. Asten Group, Inc.*, 135 Wn. App. 613, 618-23, 146 P.3d 444 (2006) (reversing trial court's denial of a CR 59(h) motion to amend the judgment to provide for joint and several liability rather than several liability).

We review a trial court's decision to grant or deny a CR 59 motion for abuse of discretion.  *Worden v. Smith*, 178 Wn. App. 309, 322, 314 P.3d 1125 (2013).  A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.  *Id.* at 323.  A court necessarily abuses its discretion if its decision is based on an erroneous view of the law.  *Id.*

2.   Sufficient Notice

The Burkes argue that JHC waived its right to request periodic payments because it did not give sufficient notice that it planned to invoke RCW 4.56.260.  This argument is incorrect.

In *Esparza v. Skyreach Equipment, Inc.*, the defendant failed to notify the plaintiff of its intention to request periodic payments under RCW 4.56.260 until after the jury returned its verdict.  103 Wn. App. 916, 921, 15 P.3d 188 (2000).  The trial court denied the defendant's postverdict motion for periodic payments because it came too late, and the appellate court agreed.  *Id.* at 942. The court quoted with approval a California case stating that a request for periodic payments must be made at least before the plaintiff's economic expert testified.  *Id.* at 943.  The court emphasized that advance notice was required because the plaintiff must have the opportunity to have its economic expert address the present value of future damages and the jury must be instructed to allocate separate amounts for each category of future damages.  *Id.* at 943-44.

Here, the record shows that JHC provided notice of its intent to invoke RCW 4.56.260 on four different occasions: in its April 2017 answer to the Burkes' complaint, in its June 2018 answers to discovery requests, during trial in the context of the examination of JB's guardian, and during the conference on jury instructions. In addition, the trial court's special verdict form contained separate lines for LB's future medical care, future services, future wage loss, and noneconomic damages as JHC requested for purposes of RCW 4.56.260. In comparison, the defendant in *Esparza* failed to provide any notice regarding its intent to seek periodic payments until after the jury had returned its verdict, which included a lump sum award for future economic damages. 103 Wn. App. at 921.

Further, the Burkes' expert was able to address the present value of LB's future economic damages. And the trial court instructed the jury that "[a]ny award for future economic damages must be for the present cash value of those damages." CP at 2156. "Present cash value" was defined as "the sum of money needed now which, if invested at a reasonable rate of return, would equal the amount of loss at the time in the future when the expenses must be paid or the earnings would have been received." CP at 2156. Instruction number 20 further instructed the jury to apply the rate of interest as the "rate which in your judgment is reasonable under all the circumstances." CP at 2156. In *Esparza*, there apparently was no expert testimony regarding present value and the jury was not instructed on discounting future damages to present value. 103 Wn. App. at 944.

The better course of action may have been for JHC to reiterate its previously stated intent to request periodic payments at the beginning of trial or at least before the Burks' economic expert testified. However, Dr. DeKay testified at length about the present value of future economic damages anyway.

We conclude that JHC gave the Burkes and the trial court sufficient notice of its intent to request periodic payments under RCW 4.56.260.

3.    Submission of Periodic Payment Proposal

The Burkes argue that JHC waived its right to request periodic payments because it did not submit a proposal for a periodic payment plan before judgment was entered.  This argument is incorrect.

RCW 4.56.260(2) plainly states that "[p]rior to entry of judgment, *the court* shall request each party to submit a proposal for periodic payment of future economic damages to compensate the claimant."  (Emphasis added.)  Therefore, a party technically does not need to provide a proposal for periodic payment when it notifies the other party and the court of its intent to seek periodic payment under RCW 4.56.260.  Instead, a periodic payment proposal need only be submitted after the trial court requests one.

We conclude that JHC did not waive its right to request periodic payments under RCW 4.56.260 by not submitting a proposal for a periodic payment plan before judgment was entered.

4.    Failure to Object to Judgment

The Burkes argue that JHC waived its right to request periodic payments because it did not object to the judgment on the verdict that the trial court entered without a provision for periodic payments for future economic damages.  This argument is incorrect.

The plain language of RCW 4.56.260(1) and (2) contemplates that a defendant will request periodic payments before entry of judgment.  RCW 4.56.260(1) states that a trial court must include periodic payments in the judgment when a party requests it.  And RCW 4.56.260(2) requires the court to request proposals for periodic payments before entry of judgment.

41

Here, JHC allowed the trial court to enter a judgment on the verdict that did not include periodic payments. JHC certainly should have raised RCW 4.56.260 before entry of the judgment and requested that the court follow the procedure set forth in RCW 4.56.260(2).

However, CR 59(h) allows a party to file a motion to amend a judgment within 10 days after the judgment was entered. CR 59(h) does not state that a party is required to object to entry of the judgment in order to file a motion to amend, and the Burkes do not argue otherwise. In addition, the Burkes do not argue that CR 59(h) did not authorize the trial court's amendment of the judgment here. In fact, the Burkes do not mention CR 59(h) at all.

We conclude that JHC did not waive its right to request periodic payments under RCW 4.56.260 by not objecting to entry of the original judgment.

### 5. Summary

We hold that the trial court did not err when it granted JHC's motion to amend judgment to provide for periodic payments regarding future economic damages. On remand, the trial court must follow the procedure outlined in RCW 4.56.260(2). The trial court's periodic payment plan must reflect the fact that LB's future economic damages already have been reduced to present value.

## H. CONSTITUTIONALITY OF RCW 4.56.260

The Burkes argue in the alternative that JHC cannot seek periodic payments under RCW 4.56.260 because it is unconstitutional on its face. This argument is incorrect.

### 1. Standard of Review

"Whether a statute is constitutional is a question of law that we review de novo." *Afoa v. Dep't of Labor & Indus.*, 3 Wn. App. 2d 794, 804, 418 P.3d 190 (2018). A statute is presumed constitutional, and if possible, we will construe an enactment so as to render it constitutional.

*Kitsap County v. Kitsap Rifle & Revolver Club*, 1 Wn. App. 2d 393, 413, 405 P.3d 1026 (2017). The party challenging an enactment has the burden of showing beyond a reasonable doubt that it is unconstitutional. *Afoa*, 3 Wn. App. 2d at 804.

2. Jurisdictional Requirement of RCW 7.24.110

Initially, JHC argues that the Burkes have failed to preserve their constitutional challenges to RCW 4.56.260 because they failed to serve the attorney general with a copy of their proceedings as required by RCW 7.24.110. We disagree.

RCW 7.24.110 states, "When *declaratory relief* is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." (Emphasis added.) The statutory requirement to notify the attorney general only applies when an action is brought under the Declaratory Judgment Act. *See Watson v. Washington Preferred Life Ins. Co.*, 81 Wn.2d 403, 407-08, 502 P.2d 1016 (1972).

Here, the Burkes' action for damages originated as a tort claim against JHC. They are challenging the constitutionality of RCW 4.56.260 in an appeal, and as a result, RCW 7.24.110 is inapplicable here. A party is not expected to serve the attorney general every time a constitutional challenge to a statute is raised. *See Watson*, 81 Wn.2d at 407-08. And all the cases that JHC cites to were brought under the Uniform Declaratory Judgment Act. Therefore, we consider the Burkes' constitutional challenge.

3. Right to Jury Trial

The Burkes argue that RCW 4.56.260 violates their right to a jury trial because it requires the trial court to make factual determinations regarding the jury's award of future economic damages and to substantially alter the jury's award. This argument is incorrect.

43

Article I, section 21 of the Washington Constitution states that "[t]he right of trial by jury shall remain inviolate." The term "inviolate" means that the right of trial by jury deserves the highest protection. *Davis v. Cox*, 183 Wn.2d 269, 288, 351 P.3d 862 (2015), *abrogated on other grounds by Maytown Sand & Gravel, LLC v. Thurston County*, 191 Wn.2d 392, 423 P.3d 223 (2018). "At its core, the right of trial by jury guarantees litigants the right to have a jury resolve questions of disputed material facts." *Id.* at 289. This includes the measure of damages. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645, 771 P.2d 711 (1989). However, the right of trial by jury is not limitless. *Davis*, 183 Wn.2d at 289.

RCW 4.56.260 has no effect on the amount of damages awarded by the jury. Nor does RCW 4.56.260 dictate how the jury should compute the amount of damages to be awarded, such as whether the award should be at present cash value with inflation, present cash value without inflation, or what interest rate should apply. The jury makes the factual determination as to how to fairly compensate an injured plaintiff for future economic damages. RCW 4.56.260 only determines *the manner in which* injured plaintiffs will receive a portion of their judgment. And unlike in *Sofie*, where the Supreme Court held that RCW 4.56.250 was unconstitutional for placing a limit on recoverable noneconomic damages in violation of the right to a jury trial, 112 Wn.2d at 638, the plain language of RCW 4.56.260 does not impose a cap on damages available to an injured plaintiff.

The Burkes raise a number of arguments for the first time in their reply brief regarding RCW 4.56.260(4). But we need not consider arguments that are raised for the first time in a reply brief. *Winter v. Dep't of Soc. & Health Servs. on behalf of Winter*, 12 Wn. App. 2d 815, 842, 460 P.3d 667, *review denied*, 196 Wn.2d 1025 (2020).

Accordingly, we conclude that RCW 4.56.260 does not violate the Burkes' right to a jury trial.

### 4. Separation of Powers

The Burkes argue that RCW 4.56.260 violates the separation of powers doctrine because the legislature cannot dictate to the courts how judgments on jury verdicts should be entered. This argument is incorrect.

"The separation of powers doctrine arises out of 'the constitutional distribution of the government's authority into three branches.' " *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 625, 90 P.3d 659 (2004) (quoting *State v. Moreno*, 147 Wn.2d 500, 505, 58 P.3d 265 (2002)). Although the separation of powers doctrine creates a clear distinction between each branch of government and their respective functions, the legislative, executive, and judicial branches themselves are not " 'hermetically sealed off from one another.' " *Colvin v. Inslee*, 195 Wn.2d 879, 891, 467 P.3d 953 (2020) (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)).

The Burkes' separation of powers argument assumes that the legislature necessarily encroaches into the judiciary's domain when a statute details the means by which the trial court should enter judgment. The Burkes apparently allege that the legislature has eliminated a trial court's discretion in RCW 4.56.260 by requiring a judgment to provide for periodic payments upon a party's request. However, when RCW 4.56.260 is properly applied, the trial court simply is fashioning the method by which the injured plaintiff will receive his or her total future economic damages. And the court retains discretion with respect to which proposal for periodic payment should be adopted after the jury has already considered various factors related to

computing a fair and just award of future economic damages. Therefore, RCW 4.56.260 does not violate the separation of powers doctrine.

The Burkes argue for the first time in their reply brief that the legislature's determination that a trial court must enter periodic payments upon request under certain circumstances is equivalent to a legal conclusion, citing to *Sofie*, 112 Wn.2d 654 and *City of Tacoma v. O'Brien*, 85 Wn.2d 266, 271-72, 534 P.2d 114 (1975). However, we need not consider any arguments raised for the first time in a reply brief. *Winter*, 12 Wn. App. 2d at 842. Regardless, instructing the trial court to provide for periodic payments in the final judgment is not the equivalent of a legal conclusion. RCW 4.56.260 only impacts the way that certain future economic damages are distributed. And both *Sofie* and *O'Brien* are distinguishable from or inapplicable to this case.

Accordingly, we conclude that the Burkes failed to show that RCW 4.56.260 violates the separation of powers doctrine.

5. Right to Equal Protection

The Burkes argue that RCW 4.56.260 violates the right to equal protection because the statute discriminates between severely injured plaintiffs and less severely injured plaintiffs. This argument is incorrect.

The equal protection clause of article I, section 12 of the Washington Constitution, and the Fourteenth Amendment to the United States Constitution require that similarly situated persons receive the same treatment. *White v. Qwest Corp.*, 15 Wn. App. 2d 365, 373, 478 P.3d 96 (2020), *review denied,* 197 Wn.2d 1014 (2021).

If no fundamental right is being infringed and no suspect class is involved, as here, we apply the rational basis standard of review to an equal protection challenge. *Id.* Under this standard, a statue does not violate equal protection if "(1) it applies alike to all members within

the designated class, (2) reasonable grounds exist to support the classification, and (3) the classification bears a rational relationship to the purpose of the legislation." *Id.*

The Burkes identify the relevant class as injured plaintiffs who obtain verdicts for future economic damages, and argue that RCW 4.56.260 treats members of the same class differently because only plaintiffs who are awarded at least $100,000 in future economic damages are subject to periodic payment modifications. As a result of this classification, the Burkes claim that RCW 4.56.260 violates their right to equal protection.

However, a rational basis exists for the $100,000 threshold. One reason for requiring periodic payments is to relieve the burden on defendants who otherwise might have to make large lump sum payments for future economic damages. That concern is not as significant for smaller economic damage awards. In addition, RCW 4.56.260 was enacted as part of the 1986 Tort Reform Act, and one purpose of that legislation was to "reduce costs associated with the tort system." LAWS OF 1986, ch. 305, §§ 100, 801. Periodic payments arguably reduce costs for defendants. But again, the reduction in costs is not significant for smaller economic damage awards.

We conclude that the Burkes failed to show that RCW 4.56.260 violates their right to equal protection.

## CONCLUSION

We affirm the trial court's original judgment on jury verdict and affirm the trial court's order granting JHC's motion to amend the judgment to provide for periodic payments of future economic damages under RCW 4.56.260.

No. 54598-5-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

CRUSER, J.

VELJACIC, J.